UNITED STATES, Appellee

v.

Justin M. LEWIS, Lance Corporal
U.S. Marine Corps, Appellant

No. 05-0551

Crim. App. No. 200200089

United States Court of Appeals for the Armed Forces

Argued May 2, 2006

Decided August 9, 2006

ERDMANN, J., delivered the opinion of the court, in which
GIERKE, C.J., and CRAWFORD and BAKER, JJ., joined.  EFFRON, J.,
filed a separate concurring opinion.

Counsel

For Appellant:  Lieutenant Brian L. Mizer, JAGC, USNR (argued).

For Appellee:  Captain Roger E. Mattioli, USMC (argued);
Lieutenant Guillermo J. Rojas, JAGC, USNR, and Commander C. N.
Purnell, JAGC, USN (on brief).

**This opinion is subject to revision before final publication.**

United States v. Lewis, No. 05-0551/MC

Judge ERDMANN delivered the opinion of the court.

Lance Corporal Justin M. Lewis was charged with numerous drug offenses.  He entered guilty pleas to attempted distribution of ecstasy, conspiracy to use and distribute controlled substances, use of ecstasy, use of ketamine, use of LSD, use of methamphetamine, possession of ketamine, possession of ecstasy with the intent to distribute, and distribution of ecstasy in violation of Articles 80, 81 and 112a, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 880, 881, 912a (2000). Lewis was convicted in accordance with his pleas and sentenced to a dishonorable discharge, confinement for five years, forfeiture of all pay and allowances, and reduction to E-1.

The convening authority approved the sentence but suspended all confinement in excess of forty-two months pursuant to a pretrial agreement.  The United States Navy-Marine Corps Court of Criminal Appeals affirmed the findings and sentence.  United States v. Lewis, 61 M.J. 512, 521 (N-M. Ct. Crim. App. 2005). We granted review of three issues, which included a challenge to the Court of Criminal Appeals' determination that the unlawful command influence was harmless beyond a reasonable doubt, and alleged violations of Lewis's right to a speedy trial and speedy appellate review.[1]

---

[1] On January 19, 2006, we granted review of the following issues:

United States v. Lewis, No. 05-0551/MC

Unlawful command influence is "'the mortal enemy of military justice.'" United States v. Gore, 60 M.J. 178, 178 (C.A.A.F. 2004) (quoting United States v. Thomas, 22 M.J. 388, 393 (C.M.A. 1986)). Where it is found to exist, judicial authorities must take those steps necessary to preserve both the actual and apparent fairness of the criminal proceeding. United States v. Rivers, 49 M.J. 434, 443 (C.A.A.F. 1998); United States v. Sullivan, 26 M.J. 442, 444 (C.A.A.F. 1988). The "'appearance of unlawful command influence is as devastating to the military justice system as the actual manipulation of any given trial.'" United States v. Simpson, 58 M.J. 368, 374 (C.A.A.F. 2003) (quoting United States v. Stoneman, 57 M.J. 35, 42-43 (C.A.A.F. 2002)).

---

I. WHETHER THE LOWER COURT ERRED WHEN IT HELD THAT THE IN-COURT ACCUSATIONS BY THE STAFF JUDGE ADVOCATE AND TRIAL COUNSEL THAT THE MILITARY JUDGE WAS INVOLVED IN A HOMOSEXUAL RELATIONSHIP WITH THE CIVILIAN DEFENSE COUNSEL AMOUNTED TO UNLAWFUL COMMAND INFLUENCE BUT WERE HARMLESS BEYOND A REASONABLE DOUBT.

II. WHETHER THE GOVERNMENT DENIED APPELLANT HIS RIGHT TO A SPEEDY TRIAL UNDER THE UNITED STATES CONSTITUTION AND ARTICLE 10, UNIFORM CODE OF MILITARY JUSTICE (UCMJ), 10 U.S.C. § 810.

III. WHETHER APPELLANT WAS DENIED DUE PROCESS OF LAW WHERE HE SERVED HIS ENTIRE SENTENCE OF FORTY-TWO MONTHS CONFINEMENT BEFORE THE LOWER COURT REACHED A DECISION IN HIS CASE.

3

Lewis contends that outrageous conduct by the trial counsel and staff judge advocate (SJA) placed an intolerable strain on the public perception of fairness in his trial and the military justice system, and that the proper remedy to cure this unlawful command influence is dismissal of the charges. We conclude that under the unique circumstances of this case, no remedy short of reversal of the findings and sentence and dismissal of the charges and specifications with prejudice will ameliorate the unlawful command influence present and restore the public perception of fairness in the military justice system.

### Facts

The initial military judge detailed to this court-martial was Major (MAJ) CW. At the initial Article 39(a), UCMJ, 10 U.S.C. § 839(a) (2000), session held on November 7, 2002, MAJ CW announced her qualifications as a military judge and offered the parties the opportunity to voir dire or challenge her. Both parties declined and Lewis was arraigned. The detailed military defense counsel then announced that Lewis had retained a civilian defense counsel, Ms. JS. Ms. JS was a former Marine judge advocate who had attained the rank of colonel. Ms. JS represented Lewis at all proceedings after the first Article 39(a), UCMJ, session.

---

62 M.J. 448 (C.A.A.F. 2006).

At an Article 39(a), UCMJ, session held on January 14, 2002, MAJ CW stated that trial counsel had requested a voir dire of the military judge. The voir dire covered a number of areas including: (1) companion cases to Lewis's tried by MAJ CW as military judge; (2) MAJ CW's prior professional relationship with the civilian defense counsel, Ms. JS; (3) the number of cases presided over by MAJ CW at which Ms. JS appeared as civilian defense counsel; and (4) the extent of any social relationship between MAJ CW and Ms. JS in general, as well as any personal contact between MAJ CW and Ms. JS since the Lewis case had begun.

Concerning personal contact with Ms. JS, MAJ CW said, "She boards horses at the barn where I ride, as a hobby I ride on Sundays there, and occasionally I see her at the barn." Based upon the companion cases at which MAJ CW served as military judge, the professional relationship MAJ CW had with Ms. JS and because MAJ CW and Ms. JS had "at least interacted . . . in a very limited social way at the barn but on no other occasion", trial counsel inquired whether the military judge believed there was an "appearance of impartiality [sic]." Major CW responded that she did not believe there was "the appearance of impropriety."

Trial counsel then asked MAJ CW about another case in which she had been voir dired about whether she detailed herself to

the case and her relationship with Ms. JS. When asked if she
considered that voir dire inappropriate, MAJ CW responded in the
negative and added:

> Well, I find it interesting that I'm
> frequently voir dired on my acquaintance
> with Ms. [JS] when my other military judge
> counterparts are never voir dired on their
> acquaintance with her. She stood as their
> reviewing officer and working relationship
> with them, she's been around the Marine
> Corps for over 30 years, so I do find that
> as interesting.

Summarizing the voir dire to that point and specifically
including "having limited social interaction at the barn only",
trial counsel again asked if the military judge believed there
might be an "appearance of impartiality [sic]." In response,
MAJ CW asked trial counsel if he was making a motion for
recusal. The trial counsel said that he was not, but continued
his voir dire and inquired about yet another case in which MAJ
CW was questioned about electronic mail messages generated by
Ms. JS and her relationship with Ms. JS. Noting that trial
counsel in that case had submitted a motion for recusal, trial
counsel asked MAJ CW if she "resented that inquiry or the
subsequent motion." Major CW responded:

> I resented the -- the -- Major [W] was
> assigned to that case by the SJA for the
> specific purpose of conducting a voir dire
> of the military judge and floating the
> recusal motion, and then he was taken off
> the case before I even deliberated and ruled
> on the motion. When I went to go and ask
> him further questions on the motion, he was

> not available.  He had left the building.
> So I found, overall, his conduct and the way
> that he asked the questions, and his conduct
> in leaving before the motion was even
> resolved -- I found that to be
> unprofessional, and, yes, I was offended by
> that process.

Asked further about her reaction to that voir dire and motion, MAJ CW indicated that she "probably" told another major that she felt she had been put through "an inquisition", that she felt she had been "attacked by the government", and that she may have indicated "it would take . . . a few days to get back on good terms with the government."

Trial counsel's voir dire continued.  The questions concerned whether MAJ CW had detailed herself to Lewis's case after learning that Ms. JS would be the civilian defense counsel, the extent and nature of any communications with Ms. JS about the Lewis case, and whether MAJ CW had received copies of electronic mail generated by Ms. JS dealing with matters relating to an allegation of prosecutorial misconduct.  At this point, trial counsel made a motion for recusal as follows:

> Ma'am, at this time taken all of the facts
> that have come to light during this inquiry,
> your previous involvement with the companion
> cases, having worked with Colonel [JS] in
> the past, having a social relationship
> limited to interactions at the barn, as well
> as the fact that defense counsel in the Neff
> case apparently received statements from the
> assistant civilian defense counsel
> expressing preference for you as military
> judge, also the fact that you expressed in
> the Scamahorn case displeasure with the way

7

> that you had been voir dired in the <u>Curiel</u>
> case; also the fact that civilian defense
> counsel in this case has made a habit of
> CC'ing you on electronic mail messages which
> contained disputed and contested substantial
> issues relating to suborning perjury,
> discovery issue, and making recommendations
> to you as to what would be an appropriate
> resolution for failure to comply with
> pretrial milestones:  All of that taken
> together, ma'am, would you agree that
> creates an appearance of impartiality [sic]
> that a reasonable person might perceive with
> respect to this case, ma'am?

Emphasis added.  Asked if he had a written motion, trial counsel responded, "If the issue becomes ripe, ma'am, the government will have a written motion to reconsider."  After determining that the motion for recusal was based solely on her responses during voir dire, MAJ CW stated that she did not "think the record supports recusal of the military judge.  That's my ruling on the motion."

At this point trial counsel indicated that the Government had a written motion for reconsideration.  The written motion asserted three bases for recusal:  "the reasonable appearance of impartiality [sic] by the military judge, actual bias by the military judge, and personal knowledge of disputed evidentiary facts."  In general, the motion noted the prior professional relationship between Ms. JS and MAJ CW, some cases in which MAJ CW had docketed herself as military judge when Ms. JS was to appear as civilian defense counsel, voir dire of MAJ CW in other cases concerning her relationship with Ms. JS, Ms. JS's practice

of sending copies of electronic mail correspondence about pending cases to MAJ CW, and the companion cases to Lewis's case over which MAJ CW had presided.

Specifically, the motion stated: "On 25 November 2001, after already having presided over the arraignment in this case, and being copied on numerous electronic mail messages by the civilian defense counsel, the military judge and civilian defense counsel were observed exiting a showing of the play 'Dracula the Musical' in LaJolla, California, by Colonel [RZ]." The motion for reconsideration asserted that the appearance of impropriety arose from a number of factors, including:

> First, [MAJ CW] and [Ms. JS] have a long professional history going back nearly a decade, in which [Ms. JS] was in her chain of command and assisted her in a remedial board. Second, [MAJ CW and Ms. JS] apparently interact socially as well, and it appears that they did so after [MAJ CW] had docketed herself to the instant case.

Although the Government had obviously been aware as early as January 11, 2002 of the fact that MAJ CW and Ms. JS had attended the play, no questions were asked about that play during the voir dire conducted on January 14, 2002. The motion for reconsideration was the first time the Government disclosed that knowledge. In further voir dire MAJ CW explained that when trial counsel initially voir dired her, she did not remember going to the play: "[I]t slipped my mind that I had gone to that play with [Ms. JS]." Major CW denied the motion for

9

reconsideration and noted that she and Ms. JS had "occasional social interaction with no discussions of any military trials pending before me."

In response to MAJ CW's ruling, the trial counsel requested a seventy-two-hour continuance to determine whether the Government would appeal MAJ CW's ruling under Article 62, UCMJ, 10 U.S.C. § 862 (2000).  See Rule for Courts-Martial (R.C.M.) 908(b)(1).  Trial counsel revealed that he had already coordinated with the appellate government division and that they were not yet certain whether the challenge to MAJ CW's ruling would be a Government appeal or a request for extraordinary relief.  Major CW denied the request for a continuance.  Trial counsel then asked for a three-hour continuance in order to seek a stay of the trial proceedings.  That request was also denied.

At an Article 39(a), UCMJ, session held on January 15, 2002, to litigate defense motions relating to pretrial confinement and prosecutorial misconduct, the defense called the SJA of the 1st Marine Division, Lieutenant Colonel (LTC) JC, as a witness on the prosecutorial misconduct motion.  The SJA was asked about his role in the earlier voir dire of MAJ CW.  The SJA indicated that he had given "[g]eneral advice on voir dire" to the trial counsel and had passed along some unspecified things he had heard.

In explaining some of the advice he had given to trial counsel, the SJA stated that "there was some evidence out there that, in fact, the defense lawyer had been on a date with the judge while this case was pending." The SJA also revealed that he had conversations about a Government appeal or extraordinary writ with Colonel (COL) RF at the appellate government division during which the SJA also conveyed the things he had heard. Those conversations included "the apparent discrepancy on the record when the military judge could not recall going on a date" as well as the fact that Ms. JS did not correct MAJ CW when she omitted any mention of the play during voir dire. Asked if he had discussed any particular evidence of bias on the part of MAJ CW, the SJA said:

> A perfect example, and I relayed this to Colonel [RF], a perfect example is while [trial counsel was] addressing the court this morning, [Ms. JS] starts strolling around the courtroom, just walking around anywhere she wants to go. I've never seen that in any court of law in my life. The body movement being exhibited, in my opinion, which I told Colonel [RF] was that [Ms. JS] is running this court-martial, and [Col. RF] was very interested in that. If you really want to get tacky -- and I'll tell you what else I told Colonel [RF].

The SJA also discussed his "own personal bias observations" with COL RF. The SJA's testimony was periodically marked by direct exchanges with Ms. JS. The personal nature of this matter was reflected later when Ms. JS considered withdrawing

from the case. However, having advised Lewis of her concerns, Ms. JS remained on the case at Lewis's insistence.[2]

At a later Article 39(a), UCMJ, session MAJ CW indicated she had been informed that a stay of proceedings had been prepared by the appellate government division. She announced for the record that the contents of that stay request had been read to her over the phone. Based on the prior proceedings and the information that had been read over the phone, MAJ CW again reconsidered her denial of the recusal motion and concluded she could continue to sit as military judge.

The next day, January 17, 2002, after receiving evidence on the prosecutorial misconduct and pretrial confinement motions and following an overnight recess, MAJ CW indicated that she had once again reconsidered her ruling on the recusal motion and had decided to recuse herself at this point:

> I'm sure everyone in the courtroom can see
> that I'm emotional about this. I handled
> the government's request to voir dire the
> military judge badly. I was thrown off
> balance by the motion. I didn't expect it
> from [trial counsel]; it was not a timely
> request. No notice had been given. I
> should have demanded a good faith basis for
> his questions.
>
> I tried to answer the questions that were
> asked to my best recollection as they were

---

[2] When called to testify as a defense witness on the motions, Lewis's mother stated that her observations to this point caused her to have little faith in fairness of the trial. She characterized her observations of the SJA's earlier testimony as a "personal vendetta."

12

asked because I felt I had nothing to hide. I didn't feel it necessary to expand on my answers because I believe that my association with [Ms. JS] is not improper. My poor memory for people and places now has people questioning my truthfulness on the record.  In good faith I tried to apply the law regarding the disqualification of the military judge to this case.  I believe that I could strike the balance between the interests of the government and getting a sentencing hearing free from any appearance of impropriety and Lance Corporal Lewis' interests in getting a fair and prompt resolution of his charges.

I stand by my earlier analysis and findings; however, testimony of the trial counsel and the SJA demonstrate how little it takes to create an appearance of impropriety in some people's minds.  I'm mortally disappointed in the professional community that is willing to draw such slanderous conclusions from so little information.  I wish I could do this with less emotion.

I now find myself second guessing every decision in this case.  Did I favor the government to protect myself from further assault?  Did I favor the accused to retaliate against the government[?]

. . . .

I have consulted with the circuit military judge and other judges in the circuit in making this decision.  I'm granting the motion for recusal for two reasons:  One, in an abundance of caution, interpreting appearance of impropriety at its broadest possible meaning; and two, because my emotional reaction to the slanderous conduct of the SJA has invaded my deliberative process on the motions.  The proceeding should begin anew at arraignment.

13

> The court is in recess until a new military
> judge is detailed and a new trial schedule
> is set. I apologize to everyone.

Almost a month later, on February 15, 2002, an Article 39(a), UCMJ, session was convened before a new military judge, LTC FD. After making a record of the various administrative proceedings that had occurred since MAJ CW's recusal, LTC FD announced that after reading the record and considering some of his R.C.M. 802 conference rulings, he had decided to disqualify himself from Lewis's case. Lieutenant Colonel FD stated that he had concluded that "a reasonable person knowing the facts of this case might reasonably question my impartiality, and . . . I do have a personal bias or prejudice concerning a party." Further, concerning MAJ CW's recusal, LTC FD made the following comments:

> The manner in which [trial counsel] handled
> the voir dire in this case particularly
> offends me. Further, the SJA's crass,
> sarcastic, and scurrilous characterization
> of the social interaction between Major [CW]
> and Ms. [JS], bespeaks an ignorance,
> prejudice, and paranoia on the part of the
> government that I can neither understand nor
> set aside. Accordingly, I am recusing
> myself from further service on the court-
> martial.

On February 22, 2002, an Article 39(a), UCMJ, session was convened before a new military judge, Captain (CAPT) PF, who had been detailed to the case from another judicial circuit. Concerned with any further delay in litigating a motion to

release Lewis from pretrial confinement, CAPT PF arranged for another military judge, Commander (CDR) RW, to hear a defense motion to release Lewis from pretrial confinement. Commander RW heard that motion four days later and ordered Lewis released from pretrial confinement on that same day. Lewis had been in pretrial confinement from August 14, 2001, until February 26, 2002, a period of 197 days. Lewis spent forty of those days confined after MAJ CW had recused herself from the case.

On March 11, 2002, the court reconvened with CAPT PF again serving as military judge. Over the next two days CAPT PF heard and ruled upon numerous defense motions including a motion for administrative pretrial confinement credit, a motion for a change of venue, a motion for dismissal based upon a violation of Lewis's right to a speedy trial, a motion for mistrial, a motion to dismiss for unlawful command influence, and a motion to dismiss for prosecutorial misconduct. A number of these motions involved allegations relating to the trial counsel's voir dire of MAJ CW and the SJA's conduct with respect to the Government's effort to unseat MAJ CW as military judge.

Although CAPT PF denied the motion to dismiss for unlawful command influence, he did order some relief on the related motion for a change of venue. Captain PF noted that the defense had received a change to a military judge from another judicial circuit. He further ordered that the SJA be disqualified from

further participation in the case, that the SJA be prohibited from observing further trial proceedings, and that a substitute convening authority assume all post-trial responsibilities for the case.  Captain PF also cautioned that although he was not ordering that all court members be selected from another military installation, the members should be carefully scrutinized to ensure that they were not tainted by the prior conduct in Lewis's case.  Lewis subsequently chose trial by military judge alone, entered guilty pleas pursuant to a pretrial agreement, and was sentenced by CAPT PF as the military judge.

Discussion

Article 37(a), UCMJ, 10 U.S.C. § 837(a) (2000), establishes the congressional prohibitions against unlawfully influencing the action of a court-martial:

> No authority convening a general, special, or summary court-martial, nor any other commanding officer, may censure, reprimand, or admonish the court or any member, military judge, or counsel thereof, with respect to the findings or sentence adjudged by the court, or with respect to any other exercises of its or his functions in the conduct of the proceedings.  No person subject to this chapter may attempt to coerce or, by any unauthorized means, influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case, or the action of any convening, approving, or reviewing authority with respect to his judicial acts.

Lewis contends that there was unlawful command influence when the command, through its trial counsel and SJA, forced the recusal of MAJ CW, the first military judge detailed to his case. He contends that this conduct was designed to prevent MAJ CW from hearing his prosecutorial misconduct motion. Lewis argues that if his conviction is allowed to stand, it will create the appearance that a command can de-select military judges and orchestrate the parties to a court-martial, which raises serious doubt about the fairness of the military justice system. Lewis claims that the Government's conduct was outrageous, was not harmless beyond a reasonable doubt, and cannot be allowed to stand without penalty.

The Government responds that there was no unlawful command influence and, even if there was, it had no prejudicial effect in this case. Noting that Lewis was not entitled to a specific military judge to try his case, the Government argues that the military judge was properly changed before Lewis requested trial by military judge alone and that a change in military judges is not a recognizable form of prejudice. The Government argues that there were protective remedial steps taken that ensured the integrity of Lewis's court-martial and that, absent any demonstrable prejudice, no relief is warranted.

At the outset we note that the granted issue and question before us is not whether the defense has met its burden of

17

United States v. Lewis, No. 05-0551/MC

raising unlawful command influence or whether there was unlawful command influence in Lewis's case.  Those issues were resolved by the Court of Criminal Appeals:

> The unprofessional actions of the trial counsel and the SJA improperly succeeded in getting the military judge to recuse herself from the appellant's court-martial.  There can be no doubt that, but for the improper actions, the appellant would have been tried by Maj. W, vice the judges from the Southwest Circuit.  To the extent that the SJA, a representative of the convening authority, advised the trial counsel in the voir dire assault on the military judge and to the extent that his unprofessional behavior as a witness and inflammatory testimony created a bias in the military judge, the facts establish clearly that there was unlawful command influence on the court-martial.

Lewis, 61 M.J. at 518.  The granted issue on unlawful command influence does not challenge that ruling, nor has the Government certified the correctness of the lower court's conclusion that there was unlawful command influence.  See Article 67(a)(2), UCMJ, 10 U.S.C. § 867(a)(2) (2000).

Where neither party appeals a ruling of the court below, that ruling will normally be regarded as law of the case and binding upon the parties.  United States v. Parker, 62 M.J. 459, 464 (C.A.A.F. 2006) (citing United States v. Doss, 57 M.J. 182, 185 (C.A.A.F. 2002)); see also United States v. Grooters, 39 M.J. 269, 272-73 (C.M.A. 1994); United States v. Sales, 22 M.J. 305, 307 (C.M.A. 1986).  The law of the case doctrine is a

18

matter of discretionary appellate policy and does not prohibit this court from reviewing the ruling below.  Parker, 62 M.J. at 464-65; United States v. Walker, 57 M.J. 174, 177 n.3 (C.A.A.F. 2002) (citing United States v. Williams, 41 M.J. 134, 135 n.2 (C.M.A. 1994)).  However, under the law of the case doctrine this court will not review the lower court's ruling unless "the lower court's decision is 'clearly erroneous and would work a manifest injustice' if the parties were bound by it."  Doss, 57 M.J. at 185 (quoting Williams, 41 M.J. at 135 n.2).  "That standard is difficult to achieve:  a finding of manifest injustice requires a definite and firm conviction that a prior ruling on a material matter is unreasonable or obviously wrong." Ellis v. United States, 313 F.3d 636, 648-49 (1st Cir. 2002); see also United States v. Moran, 393 F.3d 1, 7-8 (1st Cir. 2004) (describing the burden of establishing manifest injustice as "a steep uphill climb").

Although the Government has argued in its brief that there was no unlawful command influence and did not concede the existence of unlawful command influence during oral argument, it has not carried its burden of establishing that the ruling of the Navy-Marine Corps court was clearly erroneous or that adhering to its ruling would create a manifest injustice.  Nor does the record in this case support a determination that the conclusion that unlawful command influence existed was clearly

erroneous or amounted to a manifest injustice.  Therefore, we conclude that the lower court's determination that there was unlawful command influence is the law of the case and we will not review that determination.

As a general matter, "the defense has the initial burden of raising the issue of unlawful command influence."  United States v. Biagase, 50 M.J. 143, 150 (C.A.A.F. 1999) (citing United States v. Stombaugh, 40 M.J. 208, 213 (C.M.A. 1994)).  At trial, the defense meets its burden by showing "facts which, if true, constitute unlawful command influence, and that the alleged unlawful command influence has a logical connection to the court-martial, in terms of its potential to cause unfairness in the proceedings."  Id. at 150.  A similar burden exists for the defense on appeal where the defense raises unlawful command influence by showing:  "'(1) facts which, if true, constitute unlawful command influence; (2) . . . that the proceedings were unfair; and (3) . . . that unlawful command influence was the cause of the unfairness.'"  United States v. Richter, 51 M.J. 213, 224 (C.A.A.F. 1999) (quoting Biagase, 50 M.J. at 150).  Once the issue of unlawful command influence has been raised, the burden shifts to the government to demonstrate beyond a reasonable doubt either that there was no unlawful command influence or that the proceedings were untainted.  Stoneman, 57 M.J. at 41.  This burden is high because "'command influence

20

United States v. Lewis, No. 05-0551/MC

tends to deprive servicemembers of their constitutional rights.'" Gore, 60 M.J. at 185 (quoting Thomas, 22 M.J. at 393).

Because the conclusion of the Navy-Marine Corps Court of Criminal Appeals that there was unlawful command influence is law of the case, we need not determine whether Lewis has met the burden of raising the issue nor need we review whether the Government has demonstrated beyond a reasonable doubt that there was no command influence. We are concerned only with whether the Government has met its burden of demonstrating, beyond a reasonable doubt, that these proceedings were untainted by unlawful command influence. We review this question de novo. See United States v. Kreutzer, 61 M.J. 293, 299 (C.A.A.F. 2005) (de novo review of whether constitutional error is harmless beyond a reasonable doubt); United States v. Villareal, 52 M.J. 27, 30 (C.A.A.F. 1999) (de novo review of issues of unlawful command influence). Our review of the effect of this unlawful command influence must necessarily consider both whether actual command influence was cleansed from these proceedings as well as whether any perceived unlawful command influence has been eradicated. Simpson, 58 M.J. at 374; Stoneman, 57 M.J. at 42. We turn first to the actual unlawful command influence in this case.

21

Authority to detail military judges has been delegated to service secretaries. Article 26(a), UCMJ, 10 U.S.C. § 826(a) (2000). The Secretary of the Navy has further delegated that authority to the Judge Advocate General who has prescribed that military judges will be detailed by and from a standing judiciary. See Dep't of the Navy, Judge Advocate General Instr. 5800.7D, Manual of the Judge Advocate General (JAGMAN) para. 0130a.(1) (Mar. 15, 2004); Dep't of the Navy, Judge Advocate General Instr. 5813.4G, Navy-Marine Corps Trial Judiciary para. 6 (Feb. 10, 2006). In addition, military judges of general courts-martial are "designated by" and "directly responsible to" the Judge Advocate General of the service. Article 26(c), UCMJ. Neither the government nor the defense at a court-martial is vested with the power to designate, detail, or select the military judge. Conversely, neither party can usurp the authority of the service secretaries or Judge Advocates General by removing or unseating properly certified and detailed military judges.

A military judge "'shall perform the duties of judicial office impartially and fairly.'" United States v. Quintanilla, 56 M.J. 37, 42 (C.A.A.F. 2001) (quoting Canon 3 of the American Bar Association Model Code of Judicial Conduct (2000 ed.)). Both the accused and the government are "permitted to question the military judge and to present evidence regarding a possible

22

ground for disqualification." R.C.M. 902(d)(2). Should grounds arise, the "military judge shall disqualify himself or herself in any proceeding in which that military judge's impartiality might reasonably be questioned." R.C.M. 902(a).

The orchestrated effort to unseat MAJ CW as military judge exceeded any legitimate exercise of the right conferred upon the Government to question or challenge a military judge. But for the Government's attack upon MAJ CW, it appears unlikely that there existed grounds for disqualification. Nevertheless, through suggestion, innuendo, and the SJA's personal characterization of the relationship between MAJ CW and Ms. JS, the Government compelled MAJ CW to remove herself from the case. Major CW's own words clearly illustrate how the Government itself created this disqualification:

> [T]estimony of the trial counsel and the SJA demonstrate how little it takes to create an appearance of impropriety in some people's minds. I'm mortally disappointed in the professional community that is willing to draw such slanderous conclusions from so little information. I wish I could do this with less emotion.

> I now find myself second guessing every decision in this case. Did I favor the government to protect myself from further assault? Did I favor the accused to retaliate against the government[?]

Major CW's recusal was the result of an unlawful effort to unseat an otherwise properly detailed and qualified military

23

judge.  As found by the Court of Criminal Appeals, this was actual unlawful command influence.  Lewis, 61 M.J. at 518.

The record reflects that the SJA -- a staff officer to and legal representative for the convening authority -- was actively engaged in the effort to unseat MAJ CW as military judge.  The trial counsel, who was provided advice on voir diring MAJ CW by the SJA, became the tool through which this effort was executed.  The SJA went so far as to coordinate a possible review of MAJ CW's decision by the Navy-Marine Corps court and in so doing he passed along his own gratuitous characterization of MAJ CW's relationship with Ms. JS.  The record also makes it clear that the effort to unseat MAJ CW in Lewis's case was a continuation of an ongoing effort to remove MAJ CW from any case in which Ms. JS served as civilian defense counsel.  Major CW made note of this effort on the record:  "Well, I find it interesting that I'm frequently voir dired on my acquaintance with Ms. [JS] when my other military judge counterparts are never voir dired on their acquaintance with her."

We are not convinced beyond a reasonable doubt that the effects of this actual unlawful command influence were ameliorated by later actions and remedial steps.  We are concerned that the SJA's instrument in the courtroom, the trial counsel, remained an active member of the prosecution despite participating fully in the unlawful command influence.  In

24

short, the Government has not sustained its burden of demonstrating beyond a reasonable doubt that Lewis's court-martial was free from the effects of actual unlawful command influence from the moment that MAJ CW was detailed as military judge.

We do not doubt the qualifications and neutrality of CAPT PF or CDR RW who eventually served as military judges in Lewis's case. We are also mindful of the remedial measures ordered by CAPT PF when he directed that the SJA be disqualified, that the SJA be barred from sitting in the courtroom, and that there be a new convening authority for post-trial actions. A military judge should direct such measures when he or she finds unlawful command influence in a given case. See Rivers, 49 M.J. at 443; Sullivan, 26 M.J. at 444. However, the actions taken by CAPT PF fell short of removing doubts about the impact of the actual unlawful command influence in this case.[3]

Our review of the command influence in this case is not limited to actual unlawful influence and its effect on this trial. Congress and this court are concerned not only with eliminating actual unlawful command influence, but also with "eliminating even the appearance of unlawful command influence

---

[3] Our decision in this case is based upon its unique facts as it is presented to us. We do not speculate on what our decision might have been had CAPT PF directed other remedial steps, short of dismissal with prejudice, which would have put the case before us in a different posture.

25

at courts-martial." United States v. Rosser, 6 M.J. 267, 271 (C.M.A. 1979). "[O]nce unlawful command influence is raised, 'we believe it incumbent on the military judge to act in the spirit of the Code by avoiding even the appearance of evil in his courtroom and by establishing the confidence of the general public in the fairness of the court-martial proceedings.'" Stoneman, 57 M.J. at 42 (quoting Rosser, 6 M.J. at 271). This call to maintain the public's confidence that military justice is free from unlawful command influence follows from the fact that even the "'appearance of unlawful command influence is as devastating to the military justice system as the actual manipulation of any given trial.'" Simpson, 58 M.J. at 374 (quoting Stoneman, 57 M.J. at 42-43). Thus, "disposition of an issue of unlawful command influence falls short if it fails to take into consideration . . . the appearance of unlawful command influence at courts-martial." Id.

Whether the conduct of the Government in this case created an appearance of unlawful command influence is determined objectively. Stoneman, 57 M.J. at 42. "Even if there was no actual unlawful command influence, there may be a question whether the influence of command placed an 'intolerable strain on public perception of the military justice system.'" Id. at 42-43 (quoting United States v. Wiesen, 56 M.J. 172, 175 (C.A.A.F. 2001)). The objective test for the appearance of

unlawful command influence is similar to the tests we apply in reviewing questions of implied bias on the part of court members or in reviewing challenges to military judges for an appearance of conflict of interest.  See, e.g., United States v. Miles, 58 M.J. 192, 194 (C.A.A.F. 2003); United States v. Calhoun, 49 M.J. 485, 488 (C.A.A.F. 1998); see also 28 U.S.C. § 455 (2000); R.C.M. 902(a); R.C.M. 912(f)(1)(N).  We focus upon the perception of fairness in the military justice system as viewed through the eyes of a reasonable member of the public.  Thus, the appearance of unlawful command influence will exist where an objective, disinterested observer, fully informed of all the facts and circumstances, would harbor a significant doubt about the fairness of the proceeding.  Applying this test to the instant case, we believe that a reasonable observer would have significant doubt about the fairness of this court-martial in light of the Government's conduct with respect to MAJ CW.

To find that the appearance of command influence has been ameliorated and made harmless beyond a reasonable doubt, the Government must convince us that the disinterested public would now believe Lewis received a trial free from the effects of unlawful command influence.  Despite the fact that CAPT PF was from another judicial circuit and even though he ordered some remedial action, we are not convinced that these proceedings have been cleansed of the appearance of unlawful command

27

influence. The Government wanted to ensure that a given military judge, properly detailed and otherwise qualified, would not sit on Lewis's case. In the end, the Government achieved its goal through unlawful command influence. To this point, from an objective standpoint, the Government has accomplished its desired end and suffered no detriment or sanction for its actions.[4]

Because we conclude that neither actual nor apparent unlawful command influence have been cured beyond a reasonable doubt, we must consider what relief, if any, should be fashioned in this case. In Rosser, 6 M.J. at 273, after concluding that a military judge did not properly consider the appearance of unlawful command influence over witnesses and court members, we set aside the findings and sentence and authorized a rehearing. In United States v. Grady, 15 M.J. 275, 276-77 (C.M.A. 1983), we also set aside the findings and sentence, and authorized a rehearing where we concluded that the military judge did not ensure Grady a trial by members "unencumbered from powerful

---

[4] The record before us does not indicate whether the unlawful command influence in this case was the subject of any ethical or disciplinary investigations or sanctions. Had such occurred, they could have had an impact on the public's perception and perhaps restored some confidence in the military justice system. Similarly, we are concerned that there appears to be no response from supervisory officials such as the Staff Judge Advocate to the Commandant of the Marine Corps or the Judge Advocate General of the Navy. Therefore, we direct that the Clerk of the Court send copies of this decision to those officials for review and consideration of appropriate action, if any.

United States v. Lewis, No. 05-0551/MC

external influences." In Villareal, 52 M.J. at 30, we found that the appearance of unlawful command influence upon a convening authority was cured because the charges were forwarded to a new convening authority after any possible taint arose. The remedial actions taken or approved above have a common thread in that they address the unique circumstances of each unlawful command influence issue individually and they remedy the specific harm.

To fashion an appropriate remedy in this case, we must consider both the specific unlawful influence (unseating of the military judge) and the damage to the public perception of fairness. Since the appearance of unlawful influence was created by the Government achieving its goal of removing MAJ CW without sanction, a rehearing before any military judge other than MAJ CW would simply perpetuate this perception of unfairness. Further, even if we wished to consider ordering a rehearing before MAJ CW, that option is unavailable in light of her acknowledgement that the conduct of the SJA "invaded [her] deliberative process" and influenced her specific decision to disqualify herself from this case.

We have long held that dismissal is a drastic remedy and courts must look to see whether alternative remedies are available. United States v. Cooper, 35 M.J. 417, 422 (C.M.A. 1992). Dismissal of charges with prejudice, however, is an

United States v. Lewis, No. 05-0551/MC

appropriate remedy where the error cannot be rendered harmless. Gore, 60 M.J. at 189 (holding that a military judge did not abuse his discretion in dismissing charges with prejudice to remedy unlawful command influence).

Having found that the unlawful command influence in this case has not been cured, we cannot let the findings and sentence stand. Although it is drastic, we believe that the only remedy to cure the unlawful command influence in this case is to reverse the decision of the lower court, set aside the findings and sentence, and dismiss the charges with prejudice. We do not do so lightly, but the nature of the unlawful conduct in this case, combined with the unavailability of any other remedy that will eradicate the unlawful command influence and ensure the public perception of fairness in the military justice system, compel this result.

In light of our disposition of the first granted issue, it is unnecessary for us to address the remaining issues in this case.

### Decision

The decision of the United States Navy-Marine Corps Court of Criminal Appeals is reversed. The findings and sentence are set aside. The charges and specifications are dismissed with prejudice.

<u>United States v. Lewis</u>, No. 05-0551/MC

EFFRON, Judge (concurring):

I agree with Judge Erdmann's opinion for the Court, and write separately to underscore the unique circumstances of this case. The military judge who completed the trial and the Court of Criminal Appeals each had the opportunity to dismiss the charges without prejudice, accompanied by an order disqualifying the command from any further proceedings. Under such an order, any subsequent decisions as to investigation, preferral, and referral could have been made by commanders and legal personnel untainted by the impermissible actions in the original proceedings.

In the absence of such an order, we have before us a case in which the prejudice from unlawful command influence was compounded by post-trial processing delay. Over three years transpired from the end of trial to the completion of review by the Court of Criminal Appeals, including over fourteen months in which the case was pending action by the convening authority under Article 60, Uniform Code of Military Justice, 10 U.S.C. § 860 (2000). In light of the unlawful command influence detailed in the opinion for the Court, it would be inappropriate to subject Appellant to new proceedings after the untimely post-trial processing of this case. In that context, dismissal with prejudice provides an appropriate remedy.