# UNITED STATES NAVY-MARINE CORPS
# COURT OF CRIMINAL APPEALS
# WASHINGTON, D.C.

Before
**R.Q. WARD, J.R. MCFARLANE, K.M. MCDONALD**
Appellate Military Judges

### UNITED STATES OF AMERICA

v.

### IAN R. DUNTON
### CORPORAL (E-4), U.S. MARINE CORPS

### NMCCA 201300148
### SPECIAL COURT-MARTIAL

**Sentence Adjudged:** 28 September 2012.
**Military Judge:** LtCol Elizabeth Harvey, USMC.
**Convening Authority:** Commanding Officer, 7th Marine Regiment, 1st Marine Division (REIN), I Marine Expeditionary Force, MCAGCC, Twentynine Palms, CA.
**Staff Judge Advocate's Recommendation:** Col D.K. Margolin, USMC.
**For Appellant:** LT Jennifer Myers, JAGC, USN.
**For Appellee:** LT Ian MacLean, JAGC, USN.

### 29 May 2014

---------------------------------------------------------
### OPINION OF THE COURT
---------------------------------------------------------

**THIS OPINION DOES NOT SERVE AS BINDING PRECEDENT, BUT MAY BE CITED AS PERSUASIVE AUTHORITY UNDER NMCCA RULE OF PRACTICE AND PROCEDURE 18.2.**

WARD, Senior Judge:

Officer members sitting as a special court-martial convicted the appellant, contrary to his pleas, of two specifications of wrongful sexual contact and one specification

Corrected Opinion Issued 15 July 2014

of assault consummated by a battery,[1] in violation of Articles 120 and 128, Uniform Code of Military Justice, 10 U.S.C. §§ 920 and 928.  The members sentenced the appellant to 12 months' confinement, to forfeit $994.00 pay per month for 12 months, to be reduced to pay grade E-1, and to be discharged with a bad-conduct discharge.  The convening authority approved the sentenced as adjudged and, except for the bad-conduct discharge, ordered it executed.

On appeal, the appellant alleges multiple assignments of error.[2]  We find merit in the appellant's argument that the military judge erred by admitting over defense objection certain testimony concerning the appellant's sexual orientation.  Under the circumstances of this case, however, we conclude that the error was harmless.  We further find that no error materially prejudicial to the substantial rights of the appellant occurred. Arts. 59(a) and 66(c), UCMJ.

---

[1] Although charged with wrongful sexual contact, the members found the appellant guilty of assault consummated by a battery as a lesser included offense.

[2] (1) That Specifications 1 and 2 of the Charge, alleging wrongful sexual contact, by "touching the chest and touching the buttocks" of two male Marines failed to state an offense in that the word "chest" alleged in the specifications does not fall within the statutory definition of sexual contact under Article 120(t)(2), UCMJ;

(2) That the military judge erred by failing to *sua sponte* excuse two members for their expressed views on homosexuality;

(3) That the Commandant of the Marine Corps unlawfully influenced the panel through his remarks made at a brief conducted at Twentynine Palms ("Heritage Brief");

(4) That the military judge erred by admitted improper character evidence to prove the appellant's sexual orientation and such evidence inflamed the panel who were already predisposed against homosexual conduct;

(5) That the guilty finding for assault consummated by a battery is not legally and factually sufficient;

(6) That the military judge erred by denying his motion for release from pretrial confinement and erred in failing to award appropriate sentence credit pursuant to *United States v. Suzuki*, 14 M.J. 491 (C.M.A. 1983), raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982); and

(7) That cumulative error at trial warrants relief.

## Factual Background

The appellant, a noncommissioned officer and infantry squad leader, faced at trial three specifications of wrongfully committing sexual contact in the barracks upon three different members of his company. At the time of his offenses, two of the three Marines were members of his platoon; Corporal (Cpl) [P] and Lance Corporal (LCpl) [E]. A third victim, LCpl [B] lived in the same barracks and was a member of a different platoon within the company.

The first incident involved Cpl [P]. After a night of drinking out in town with the appellant, Cpl [P] returned to his barracks room and "passed out" in his rack. Later that evening, the appellant came into his room and sat down next to Cpl [P], who lay asleep in his bed. Cpl [P]'s roommate, Cpl [W], heard what he would later describe at trial as "a rustling noise" and then heard Cpl [P]'s voice saying "get your f[**]king hands out of my pants."[3] When Cpl [W] got out of his bed and went to look, he observed the appellant sitting next to a prone Cpl [P] with one hand down Cpl [P]'s pants. Cpl [W] then told the appellant to leave the room and he obliged. The next morning, Cpl [W] told Cpl [P] what happened. Although Cpl [P] later testified at trial that learning of the appellant's conduct "made him angry", he did not report the incident.[4]

Several days later, the incident with LCpl [B] occurred. The appellant, drunk, approached LCpl [B], also drunk, on the catwalk outside LCpl [B]'s barracks room. LCpl [B] then went into his room and went to bed. The next morning LCpl [B] awoke to find the appellant lying naked next to him in his bed with the appellant's hand under LCpl [B]'s shirt resting on his chest. LCpl [B] hurriedly got up and went into the bathroom. After showering and shaving, he came back into the room to find the appellant gone. LCpl [B] then went downstairs for morning formation. As several others had already seen the appellant lying in bed next to LCpl [B], word quickly spread among the platoon, and several other Marines at formation began teasing LCpl [B]. However, LCpl [B] did not report what had happened.

---

[3] Record at 294-95.

[4] *Id*. at 316-17.

The third incident occurred some months later, this time with LCpl [E].  That evening while LCpl [E] was sitting in his room playing a video game, the appellant knocked on the door.  After LCpl [E] opened the door he sat back down and continued playing his video game.  The appellant eventually came over and sat down on the arm of LCpl [E]'s chair, drinking a beer and watching.  LCpl [E] testified at trial that the appellant leaned over, unzipped LCpl [E's] fleece shirt, placed his hand down LCpl [E]'s shirt and began rubbing LCpl [E's] bare chest.  LCpl [E] then described how after he removed the appellant's hand and leaned forward, the appellant "shoved" his hand down the back of LCpl [E]'s sweatpants and grabbed his buttocks.[5]  LCpl [E] abruptly stood up and after telling his roommate he needed to go do laundry, he left the room.  LCpl [E] then went to find the duty noncommissioned officer (DNCO) to get the appellant out of his room.  Approximately five minutes later the DNCO came to the room and told the appellant to leave.

After speaking with the DNCO, LCpl [E] told Cpl [W] what happened.  Cpl [W] and LCpl [E], along with two others, Cpl [S] and Cpl [P], then went to the duty hut to report the incident in the duty logbook.  On the way to the duty hut or shortly after arrival, the group encountered the appellant.  Accounts of what happened next differed at trial.  What is clear is that an altercation ensued during which Cpl [P] punched the appellant in the face and one other Marine took the appellant to the ground in a "full mount" hold.  Following this scuffle, LCpl [E] reported the earlier events of the evening.

An investigation ensued soon after LCpl [E] reported the appellant's conduct.  Along with LCpl [E], Cpl [P] and LCpl [B] also reported unwelcome physical contact from the appellant that occurred months earlier.  After charges were referred to trial, several additional Marines also reported similar unwelcome physical contact from the appellant.[6]  One of these additional Marines was LCpl [T].  He alleged that one evening the appellant approached him while LCpl [T] was standing on the catwalk outside his barracks room.  He described the appellant as being very drunk.  The appellant came up and put his arm around LCpl

---

[5] *Id*. at 418.

[6] Appellate Exhibit XVII at 13-14, 31-32, 34-43.

[T]'s shoulder in a manner that LCpl [T] later described at trial as "awkward."

During his testimony, LCpl [T] also described how, in an effort to get away from the appellant, he went into his barracks room and sat down in a chair in front of his TV and started playing a video game. He testified that the appellant followed him into the room and sat down on the floor next to him. Moments later, the appellant placed his head on LCpl [T]'s leg and began rubbing his face along the top of LCpl [T]'s thigh. LCpl [T] testified that next the appellant began "passionately kissing" LCpl [T]'s forearm at which point LCpl [T] jumped up and exclaimed "What the f**k!" The appellant then left the room.

The appellant's sexual orientation and the topic of homosexuality in the military first appeared at trial as a topic addressed in supplemental member questionnaires requested by individual military counsel (IMC) and approved by the military judge.[7] During group and individual *voir dire*, the military judge and counsel for both sides also discussed the issue of homosexuality with the members.[8] During the Government's case-in-chief, the trial counsel avoided any overt reference to the appellant's sexual orientation; however, the defense opted for a different approach.

In his opening statement, IMC made the following comments alluding to the appellant's sexual orientation and a motive by the victims for fabricating their allegations:

> Gentlemen, how do you make a mountain out of a molehill? You just throw dirt on it. Today you're going to hear testimony about Corporal Dunton and that when he gets drunk, he gets overly friendly. He's a bubble breaker. Means that he invades your personal space. Now, what you're not going to hear is that Corporal Dunton is a criminal; that Corporal Dunton committed any sexual contact, any sexual assault on anybody.

---

[7] AE VI, Defense Motion for Appropriate Relief; AE XXIV, Members Questionnaires; Record at 166.

[8] Record at 232-74.

Now, let's look at what happened on the night of February 27th of this year. It was a little molehill that began with [LCpl E]. That night, the members – later that night, is when the real crime occurred. That was when [LCpl P], [Cpl W] and [Cpl S] committed a hate crime on Corporal Dunton. When Corporal Dunton was coming up, they punched him twice in the face.

. . . .

Now, don't let the government try to tell you that this was self-defense or protection of a third-party. You need to see it for what it is. It was a hate crime. If this were - - if the same incident occurred in, say, Alabama and it was three white guys beating up a black guy for the same reason, that would be a hate crime.

. . . .

[LCpl B] became a butt of the joke for the whole platoon. And they would always kid him about . . . being caught in the same bed with Corporal Dunton. And he didn't like that. Because when Corporal Dunton was under the microscope and he was the fag of the platoon, anybody who came up - - whose name was associated with him, also would take it with the same butt of the joke. . . .

So to take the heat off of himself to quit being the butt of the joke of the platoon, [LCpl B] said, you know what, what happened to me there was nothing consensual or anything about that night. That was a sexual assault. It wasn't until that night that all of a sudden he said, hey, I was sexually assaulted as well to deflect the attention off of himself (sic).

Record at 288-90.

During closing argument, IMC returned to this theme, arguing that while the appellant may be perceived as "creepy" by others, the "victims" brought their allegations forward as a means of deflecting attention and accountability for assaulting

6

the appellant, or in response to incessant teasing within the platoon and being perceived as homosexual.[9]

## **Analysis**

### 1. Relevance of the Appellant's Sexual Orientation, Probative Value and Attendant Prejudice

Before trial, the Government sought to admit under MILITARY RULE OF EVIDENCE 404(b), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.) evidence indicating that the appellant had a sexual interest in men. This evidence consisted of, *inter alia,* LCpl [T]'s testimony that the appellant followed him into his barracks room, then the appellant laid his head down on LCpl [T]'s leg and began "passionately kissing" LCpl [T]'s forearm. Following a defense motion in *limine*,[10] the military judge ruled that the appellant's interaction with LCpl [T] was sufficiently similar to the charged offenses involving LCpl [P], LCpl [B] and LCpl [E], and therefore probative of the appellant's "intent to gratify his sexual desire." Furthermore, she concluded, "[t]he probative value of this evidence [was] not substantially outweighed by the danger of unfair prejudice."[11] The Government subsequently offered this testimony at trial.

During its case-in-chief the Government also called LCpl [B], who testified concerning his encounter with the appellant. He testified that he was standing next to LCpl [J] on the catwalk outside his barracks room one evening when the appellant approached them, drunk and stumbling. LCpl [B] explained that he went inside his room and his next recollection was when he woke up the next morning in his rack with the appellant lying naked beside him, the appellant's hand resting on LCpl [B]'s chest.

---

[9] In reference to the incident with LCpl [B], IMC argued that "It got spread around. The whole company heard . . . [t]hat morning after that incident, spread like wild fire. And now who's the butt of everybody's jokes? And now who's perceived as being the homo, like Corporal Dunton? Lance Corporal [B]." Record at 555.

[10] AE XVI.

[11] Record at 168; AE LXXIII, Court Ruling on Defense Motion in Limine to Exclude Evidence under M.R.E. 404(b), at 5-6.

After LCpl [B] stepped down from the witness stand, the trial counsel next called LCpl [J].  LCpl [J] explained that he was standing next to LCpl [B] outside LCpl [B]'s barracks room that evening and he also saw the appellant approach, drunk and stumbling.  Once he saw the appellant, however, he decided to leave and go to his own room.  Despite LCpl [B]'s testimony placing the appellant drunk and outside LCpl [B]'s room, the military judge permitted the trial counsel to elicit the following testimony over defense objection:[12]

> TC: Okay. Lance Corporal [J], just to remind you of my question before we broke there.  You said that you decided to leave when you saw the [appellant] coming down the catwalk?
> WIT: Yes, sir.
>
>
> TC:  Why?
> WIT: Corporal Dunton's prior activities or prior knowledge of him.  He would get uncomfortably close to you, sir.  And I just didn't want to make it a situation.

Although LCpl [J] did not elaborate on his meaning of "a situation," the trial counsel continued to explore the innuendo:

> TC: Why did you tell [LCpl B] that he should go back to his room to – –
> WIT: I told [LCpl B] to go back to his room to stop anything from happening, sir.
>
>
> TC: At this point, did you go back to your room?
> WIT: I did, sir.
>
>
> TC: From the point you went back to your room, *do you know anything else about the – – about the [LCpl B] situation*?
> WIT: *Not anything personally, but I heard things around*.

---

[12] IMC objected on relevance grounds and improper character evidence under MIL. R. EVID. 404(b).

Record at 373-74 (emphasis added).

   a) *Mil. R. Evid. 404(b) and the Uncharged Misconduct Involving LCpl [T]*

   As the appellant objected to this evidence at trial, we review for an abuse of discretion. *United States v. Staton*, 69 M.J. 228, 230 (C.A.A.F. 2010). "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith"; however, such evidence may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, [or] identity . . . ." MILITARY RULE OF EVIDENCE 404(b), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.). To be admissible under MIL. R. EVID. 404(b), evidence of uncharged misconduct must satisfy the three-pronged test enumerated in *United States v. Reynolds*, 29 M.J. 105, 109 (C.M.A. 1989).[13]

   We begin our analysis by underscoring the importance of clearly articulating the theory of relevance under MIL. R. EVID. 404(b). Here, the Government initially offered LCpl [T]'s testimony to show intent and a "common scheme [] that when [the appellant] gets drunk, [he] finds a junior Marine or a Marine equal to him, somebody that he feels that he can get close to, and encroaches on their physical space in his intoxicated state, and progressively increases his touching with the intent to sexually gratify himself." Record at 144. The military judge agreed, in large part, with the theory of intent mainly due to the high degree of similarity between the conduct involving LCpl [T] and the charged offenses. Appellate Exhibit LXXIII at 5-6. In articulating her rationale, she distinguished the conduct involving LCpl [T] from other conduct offered by the Government as proof of sexual intent.

   On the third *Reynolds* prong, the military judge concluded that "this probative value [of intent] is not outweighed by the danger of unfair prejudice to the [appellant]" and that the

---

[13] The test looks to the following three factors: 1) does the evidence reasonably support a finding by the court members that the appellant committed prior crimes, wrongs or acts; 2) what "fact . . . of consequence" is made "more" or "less probable" by the existence of this evidence; and 3) is the "probative value . . . substantially outweighed by the danger of unfair prejudice?" *Id.* at 109.

appellant's uncharged conduct with LCpl [T] was "prejudicial, to be sure, but not unfairly so."  *Id*. at 6.  As she conducted her MIL. R. EVID. 403 balancing on the record, we afford her decision great deference and only determine whether therein lies a "'clear abuse of discretion.'"  *United States v. Tanksley*, 54 M.J. 169, 176-77 (C.A.A.F. 2000) (quoting *United States v. Manns*, 54 M.J. 14, 166 (C.A.A.F. 2000)).  As she differentiated between the probative value and attendant prejudice, and distinguished this evidence from other uncharged acts offered by the Government, we afford her great deference and conclude that there lies no clear abuse of discretion.

   b) *Probative Value and Attendant Prejudice of LCpl [J]'s Testimony*

   In evaluating the testimony of LCpl [J], however, we are not so convinced.  In short form, there existed no evidentiary value in his explaining his reason for leaving the scene when the appellant approached him and LCpl [B] on the catwalk. Anything beyond corroborating LCpl [B]'s testimony placing the appellant outside LCpl [B]'s barracks room was of little value.

   By exploring LCpl [J]'s desire to "avoid a situation" with the appellant, LCpl [J]'s testimony improperly bolstered LCpl [B]'s testimony of what happened later with unnecessary innuendo and speculation.  Explaining "why [LCpl J] left" was not material to any controversy in the case.  Defense counsel never disputed that the appellant entered LCpl [B]'s barracks room that evening after LCpl [J] left.  With little, if any, probative value and the potential prejudice arising from the sexual overtones associated with the "situation" alluded to by LCpl [J], we conclude that the military judge erred in allowing this line of testimony.  Despite recent changes in the military concerning homosexuality, the subject remains controversial, a fact borne out by the military judge's excusal of two members following *voir dire* based on their views of the subject.

   Having found error, we turn to the subject of prejudice. This was a case involving multiple allegations of unwanted sexual contact by a male accused upon other males.  The issue of the appellant's sexual orientation was placed in front of the members before trial through the supplemental questionnaires. The Government's case relied on numerous witnesses' descriptions

of the appellant passed out and naked in the rack with other Marines. Even the defense made numerous references to the appellant's sexual orientation during opening statement and closing argument. Consequently, the innuendo arising from LCpl [J]'s testimony likely caught no one by surprise. Finally, the members found the appellant not guilty of the charged offense involving sexual contact with LCpl [B] and guilty of the lesser offense involving assault consummated by battery. This cuts against the appellant's argument on appeal that the panel improperly responded to the insinuation of LCpl [J]'s testimony.

Consequently, to the extent that we find error in the military judge's ruling, we are convinced that the appellant suffered no material prejudice.

## 2. The Appearance of Unlawful Command Influence, Curative Measures and Resulting Prejudice

In another assignment of error, the appellant argues that the Commandant of the Marine Corps (CMC) unlawfully influenced the tribunal through his focus on the issue of sexual assault during his "Heritage Brief" tour, his White Letters 2-12[14] and 3-12[15] and the ensuing media coverage of both.[16] Although the military judge recognized the appearance of unlawful influence, he argues she erred by failing to revisit the issue following the impanelling of the members. Appellant's Brief of 25 Sep 2013 at 24-26.

Following a defense pretrial motion to dismiss for unlawful command influence (UCI),[17] the military judge found the appearance of UCI sufficiently raised to shift the burden to the Government. She then concluded that the Government met its burden of proving beyond a reasonable doubt that the appearance of UCI would not prejudice the appellant. Record at 167. In summarizing a RULE FOR COURTS-MARTIAL 802, MANUAL FOR COURTS-MARTIAL,

---

[14] AE XII at 45-47.

[15] AE XIII at 35.

[16] We recently addressed in detail the CMC's Heritage Brief, the ensuing media coverage, and White Letters 2-12 and 3-12 in *United States v. Howell*, No. 201200264, 2014 CCA LEXIS 321, unpublished op. (N.M.C.Ct.Crim.App. 22 May 2014).

[17] AE XII.

UNITED STATES (2012 ed.) conference with counsel wherein she notified them of her ruling, the military judge explained her ruling as follows:

> At this point, in the case, prior to members being seated, the defense's motion to dismiss is denied. However, without the identified members, the court could not make a determination concerning the effect of apparent UCI on them. The court has already allowed for the expanded questionnaire . . . . Additionally, the court intends to allow individual voir dire on the topic of the Heritage Brief and any related training or command discussions on the treatment of sexual assault cases.
>
> The liberal grant mandate will allow for liberal granting of defense challenges for cause on this matter.

Record at 167-68. The military judge then offered to provide White Letter 3-12 to any member unaware of the letter in addition to any instruction on its content desired by the parties. Finally, the military judge concluded with the following:

> Once members are seated, the defense can reevaluate and if it feels that actual or apparent UCI will still prejudice the proceedings, it may renew its motion.

*Id*. at 168.

The appellant now contends that the military judge erred by "failing to readdress the [defense motion to dismiss] after members were seated, because her initial ruling was incomplete." Appellant's Brief at 26.[18] The Government responds by arguing

---

[18] The appellant also contends that the military judge failed to rule on the issue of actual UCI citing comments made by the senior member of the panel to the defense counsel following trial. Appellant's Brief at 30-32; AE LXIX; Record at 624. We disagree. We find no evidence of any actual UCI simply because a member of the panel thought it unfair that the Government detailed more senior judge advocates to the prosecution over more junior attorneys representing the appellant. Based on our view of these comments, assuming that they are accurately represented in the record, the senior member applied his own judgment in deciding the case rather than succumbing to any of the pressures or influence identified by the defense in its UCI motion at trial.

that regardless of what transpired at trial, on appeal the appellant has failed to meet his burden of providing "some evidence" that his trial was unfair and that the unlawful influence was the cause. Government Answer of 7 Jan 2014 at 31–32 (citing *United States v. Biagase*, 50 M.J. 143, 151 (C.A.A.F. 1999).

We review allegations of UCI *de novo*. *United States v. Salyer*, 72 M.J. 415, 423 (C.A.A.F. 2013). At trial, the defense must provide "some evidence" of unlawful influence, specifically "facts which, if true, constitute unlawful command influence, and that the alleged unlawful command influence has a logical connection to the court-martial, in terms of its potential to cause unfairness in the proceedings." *Biagase,* 50 M.J. at 150 (citations omitted).

On appeal, however, the appellant carries the burden of providing some evidence that the proceedings were unfair and the unlawful influence was the cause. *United States v. Ayers*, 54 M.J. 85, 95 (C.A.A.F. 2000). The quantum of evidence required to raise UCI on appeal remains the same; "some evidence" more than mere allegation or speculation. *Id*.

Once the appellant makes this initial showing, whether at trial or on appeal, the burden shifts to the Government. The Government may meet this burden "(1) by disproving the predicate facts on which the allegation of unlawful command influence is based; (2) by persuading the military judge or the appellate court that the facts do not constitute unlawful command influence; (3) if at trial, by producing evidence proving that the unlawful command influence will not affect the proceedings; or (4), if on appeal, by persuading the appellant court that the unlawful command influence had no prejudicial impact on the court-martial." *Biagase*, 50 M.J. at 151. The quantum necessary remains proof beyond a reasonable doubt. On appeal, we must be must be convinced beyond a reasonable doubt that the unlawful command influence did not exist or that it did not affect the findings or sentence of the court-martial. *Id*.

---

Having reviewed the record, we find no evidence that the appellant met his initial burden of providing "some evidence" of actual UCI either at trial or on appeal.

13

The test for the appearance of UCI is objective. "We focus upon the perception of fairness in the military justice system as viewed through the eyes of a reasonable member of the public." *United States v. Lewis*, 63 M.J. 405, 415 (C.A.A.F. 2006). An appearance of UCI arises "where an objective, disinterested observer, fully informed of all the facts and circumstances, would harbor a significant doubt about the fairness of the proceeding." *Id*. On appeal, we view whether the "proceedings appeared to be unfair and that the unlawful command influence was the cause of the appearance of unfairness." *Ayers*, 54 M.J. at 95.

Assuming *arguendo* that the appellant satisfied his burden on appeal of raising the issue of an appearance of unlawful command influence, we are convinced beyond a reasonable doubt that any such appearance did not affect the findings or sentence of the court-martial. *Salyer*, 72 M.J. at 423.

At the time of her ruling, the military judge did not have the benefit of the members' supplemental questionnaires, *voir dire,* or challenges. She ruled that the Government met its burden of demonstrating beyond a reasonable doubt that the appearance of UCI would not prejudice the appellant at trial. However, that ruling was coupled with the additional measures of supplemental questionnaires, extensive *voir dire*, liberal challenges and potential instruction on White Letter 3-12.[19] While the appellant characterizes the ruling as "ambiguous and confusing",[20] we conclude that the military judge conditioned her ruling on those curative measures she identified at the time of her ruling.

Based on our *de novo* review of the record, we conclude that "an objective, disinterested observer, fully informed of all the

---

[19] When discussing appropriate questions for *voir dire*, both IMC and trial counsel recommended that the military judge not instruct potential members on 3-12 who were unaware of the letter. Record at 184-87. Both parties agreed the better approach to identifying member's views on sexual assault and the Heritage Brief would be better served without reference to 3-12. The military judge agreed and did not instruct any member on the contents of White Letter 3-12. Of the five members who were impaneled, only one indicated on his supplemental questionnaire that he was unaware of 3-12. AE XXIV at 8. But he also indicated he had not attended or heard the Heritage Brief and had not read White Letter 2-12. *Id*.

[20] Appellant's Brief at 32.

14

facts and circumstances, would [not] harbor a significant doubt about the fairness of the proceeding." *Lewis*, 63 M.J. at 415. The members provided comprehensive answers on the issues of the CMC's Heritage Brief, the ensuing media attention, sexual assault, homosexuality, and the military's repeal of DADT. AE XXIV; Record at 232-77. Furthermore, the military judge conducted comprehensive general *voir dire* addressing the topics of the Heritage Brief, sexual assault prevention and related issues. Record at 215-18. Each member was questioned again in more depth during individual *voir dire*. *Id*. at 232-76. The military judge granted all three defense challenges for cause, citing the liberal grant mandate on two, despite the fact that the defense raised no challenge against any member for their responses concerning the Heritage Brief. *Id*. at 277-79.

Once members were impaneled, the defense opted not to renew its UCI motion despite the military judge's earlier invitation to do so. The responses from those impaneled, whether from the supplemental questionnaires, the military judge's general *voir dire,* or from individual *voir dire,* give no appearance of unlawful influence. Last, the member's partial acquittal of one of the three charged offenses for wrongful sexual contact cuts against the appellant's argument that the Heritage Brief and its focus on sexual assault prevention unlawfully influenced the panel.

Consequently, we conclude beyond a reasonable doubt that "the disinterested public would now believe that [the appellant] received a trial free from the effects of unlawful command influence." *Lewis*, 63 M.J. at 415.

3. Remaining Assignments of Error

We have reviewed the appellant' remaining assignments of error and, after reviewing the record and applying the appropriate standard of review, conclude that they are without merit. *United States v. Clifton*, 35 M.J. 79, 81 (C.M.A. 1992).

15

## Conclusion

The findings and the sentence as approved by the convening authority are affirmed.

Judge McFARLANE and Judge McDONALD concur.

For the Court


R.H. TROIDL
Clerk of Court