UNITED STATES, Appellee

v.

Joseph B. SALYER, Corporal
U.S. Marine Corps, Appellant

No. 13-0186
Crim. App. No. 201200145

United States Court of Appeals for the Armed Forces

Argued April 2, 2013

Decided August 2, 2013

BAKER, C.J., delivered the opinion of the Court, in which
ERDMANN and STUCKY, JJ., joined. RYAN, J., filed a separate
dissenting opinion, in which COX, S.J., joined.


<u>Counsel</u>

For Appellant: Lieutenant David C. Dziengowski, JAGC, USN
(argued); Captain Paul C. LeBlanc, JAGC, USN, and Major Jeffrey
R. Liebenguth, USMC (on brief).

For Appellee: Captain Samuel C. Moore, USMC (argued); Colonel
Stephen C. Newman, USMC, and Brian K. Keller, Esq. (on brief).

Amicus Curiae on Behalf of the National Institute of Military
Justice: Philip D. Cave, Esq., Kevin J. Hejmanowski, Esq., and
Christopher Mathews, Esq. (on brief).


Military Judges: M. D. Mori, J. R. Redford, and Michael B.
Richardson


**THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION.**

Chief Judge BAKER delivered the opinion of the Court.

After the original military judge in the case recused himself, a general court-martial composed of officer and enlisted members convicted Appellant, contrary to his pleas, of wrongful possession of child pornography in violation of Article 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 934 (2006).  The adjudged and approved sentence included confinement for two years, forfeiture of all pay and allowances, reduction to pay grade E-1, and a bad-conduct discharge.  The United States Navy-Marine Corps Court of Criminal Appeals (CCA) affirmed.  United States v. Salyer, No. NMCCA 201200145, 2012 CCA LEXIS 407, at *20, 2012 WL 5208620, at *8 (N-M. Ct. Crim. App. Oct. 23, 2012) (unpublished).  The granted issue poses the questions:  Did the Government's actions cause the recusal of the original military judge and did such actions amount to unlawful influence?  If so, what remedy is warranted?[1]

---

[1] The granted issue is:

> UNDER UNITED STATES v. LEWIS, 63 M.J. 405 (C.A.A.F. 2006), A CASE IS DISMISSED WITH PREJUDICE WHEN UNLAWFUL COMMAND INFLUENCE RESULTS IN THE RECUSAL OF A MILITARY JUDGE.  HERE, THE MILITARY JUDGE RECUSED HIMSELF BECAUSE HE FOUND THAT THE GOVERNMENT'S ACTIONS MADE IT IMPOSSIBLE FOR HIM TO REMAIN ON THE CASE.  THE GOVERNMENT COMPLAINED TO HIS SUPERVISOR ABOUT A RULING, ACCESSED HIS SERVICE RECORD WITHOUT PERMISSION, AND WITH THIS INFORMATION, MOVED FOR HIS RECUSAL.  SHOULD THIS CASE BE DISMISSED WITH PREJUDICE?

We hold that the Government's conduct raised some evidence of an appearance of unlawful influence.  We further hold that the Government has not demonstrated beyond a reasonable doubt that the appearance of unlawful influence did not affect the findings or the sentence, and that dismissal of the charges with prejudice is appropriate under the circumstances of this case.

## BACKGROUND

Appellant was initially charged with one specification of wrongful distribution of images of child pornography and one specification of wrongful possession of a laptop computer containing images of child pornography.  See 2012 CCA LEXIS 407, 2012 WL 5208620.  Both specifications alleged violations of 18 U.S.C. § 2252A (2006), under Article 134, UCMJ.  Similarly, both specifications alleged conduct "prejudicial to good order and discipline or of a nature to bring discredit upon the armed forces."[2]  During an Article 39(a), UCMJ,[3] session on July 29,

---

[2] The specification under the Charge alleged:  "In that Corporal Joseph B. Salyer . . . did . . . knowingly and wrongfully distribute images of child pornography in violation of 18 U.S.C. § 2252A(a)(2)(A), which conduct was prejudicial to good order and discipline or of a nature to bring discredit upon the armed forces."

The specification under the Additional Charge alleged:  "In that Corporal Joseph B. Salyer . . . did . . . knowingly and wrongfully possess a laptop computer containing image files of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B), which conduct was prejudicial to good order and discipline or of a nature to bring discredit upon the armed forces."

[3] 10 U.S.C. § 839(a) (2006) [hereinafter Article 39(a) session].

2011, the accused was arraigned, and counsel and the military judge, Lieutenant Colonel (LtCol) Mori, announced their qualifications on the record.[4]  A discovery and motions schedule was set and the session was adjourned.  Between July 29 and November 7, two officers made appearances on the record as detailed trial counsel, Captain (Capt) Schweig, the military justice officer, and Capt Maya, who eventually acted as detailed trial counsel for the remainder of the court-martial.

At an Article 39(a) session on November 7, 2011, the Government moved to amend each specification by removing the references to 18 U.S.C. § 2252A and the language alleging conduct to the prejudice of good order and discipline.  The motion was granted and each specification now alleged a violation of clause 2 of Article 134, UCMJ.  In addition, with respect to the possession specification, trial counsel moved to strike the reference to the laptop computer.  It was apparent that the computer would be unavailable for trial.  Defense counsel objected to this proposed amendment arguing that the defense had prepared its case in reliance on the language referencing the computer.  The military judge reserved his ruling on this issue.

---

[4] Captain Milton was the detailed trial counsel for this session.

The next relevant Article 39(a) session occurred on November 14, 2011. The military judge denied the Government's motion to strike the specification's reference to the laptop. The parties also addressed the potential maximum authorized punishment in the event the accused was convicted of both offenses. The military judge indicated that for the purpose of voir dire, he would inform the members that the maximum punishment was up to thirty years, but that the issue would be revisited after the findings were returned.

After this Article 39(a) session adjourned, voir dire was conducted, challenges were granted and the members were excused. Afterwards, the military judge and the parties continued discussion on the record regarding potential rulings, including the definition of child pornography for an Article 134(2), UCMJ, offense. The Government argued that the term "minor" should be defined as a person under the age of eighteen. The defense argued that "minor" referred to a person under the age of sixteen. The following colloquy took place:

    MJ:  I am contemplating what is the age.

    TC:  Sir, according to the statute --

    MJ:  The statute is 18, right?

    TC:  Yes, sir.

    MJ:  Under the Uniform Code of Military Justice, what is
         the age of consent?

TC:   Well, sir, if the court is going to go -- this just
      refers to everything from the most applicable statute,
      child pornography refers to a minor.

MJ:   That is right.

TC:   [18 U.S.C. § 2256] has all of the definitions that
      relate to --

MJ:   What is a minor under the Uniform Code of Military
      Justice?

DC:   Under the age of 16, sir.

The military judge next addressed the apparent inconsistency of
defining a minor as one under the age of eighteen for child
pornography offenses charged under clause 1 or 2 of Article 134,
UCMJ, given the age of consent in the military was sixteen.

MJ:   Because our age of consent is 16.  A Marine could have
      sexual intercourse with a 16 year old lawfully, right,
      but if he took a picture of it, that would be a crime.
      I don't know.  It may not matter. . . . That may be
      more of a case specific argument on why it wouldn't be
      service discrediting. . . .

      . . . .

MJ:   I am inclined to make the age under the age of 16.

TC:   Sir, the government would argue that in this case
      because it is closely related to the statute that
      rather than picking and choosing from the manual or
      the statute, that we just stick with the statute.

MJ:   But you didn't charge him with violating the statute.

TC:   Right, sir, but under [United States v. Leonard], you
      look to most closely --

MJ:   -- to determine the maximum punishment.

TC:   Yes, sir.

6

This same hearing addressed the admissibility of Prosecution Exhibit (PE 5) (for identification), a one-page letter from Time Warner Cable in response to the Government's subpoena. The letter states that Appellant's wife, Danielle Salyer, was the owner of the Road Runner account and the IP address linked to the missing computer under which the offending images at issue had been downloaded. The defense objected on the ground that PE 5 was testimonial hearsay. Trial counsel argued the document was admissible as a business record. The military judge sustained the objection, without comment. Finally, the session turned to the definition of child pornography. With the issue still unresolved, the military judge indicated that he would address the question the following morning.

The next morning, November 15, 2011, the Government requested that the military judge reconsider his ruling excluding PE 5. The military judge reconsidered the ruling, but after further argument, again sustained the objection to PE 5. Discussion then turned to a conversation between Appellant and his wife regarding the laptop referred to in the possession specification, during which Appellant told his wife, "it broke and he needed to get a new one." The defense argued the statement was covered by the marital privilege. The Government argued the privilege did not apply because the communication

7

took place during an Internet chat session over an unsecured computer, and because at the time of the communication Appellant and his wife were contemplating divorce.  The Government also argued in the alternative that if the privilege applied, it was waived when Appellant later made the same statement to investigators.  The military judge ruled that there was a confidential communication, but reserved judgment on the issue of waiver.

After a recess, the court returned to the definition of child pornography.  The military judge handed the parties what had been marked as an appellate exhibit containing the definition he intended to use, stating "'Minor' means any real person under the age of sixteen years."[5]  The Government objected leading to the following colloquy:

> TC:  Sir, the government would still object to the use of 16.  And the government is not sure why the Court is choosing 16 over 18 which -- if the rest of the definitions are coming from the statute, why the court would --
>
> MJ:  Because I am -- I am applying the age of consent in the military.
>
> TC:  But the consent in the military isn't at issue.  It is not being charged that Corporal Salyer was chatting with any of these.
>
> MJ:  This is what I am using.  I am using this.
>
> TC:  Yes, sir.

---

[5] This document is simply an untitled sheet of paper containing the military judge's definitions.

8

. . . .

TC: Sir, the government would still argue that it is not a matter of whether these people -- these victims consented.

MJ: What is consent? Do I have consented in there?

TC: No, but you discussed the age of consent is 16. You can't consent to have your naked photograph taken. That is not what is at issue in this case.

MJ: Okay. Very well. I have already ruled so stop arguing about it.

TC: Yes, sir.

MJ: I explained my rationale; right?

TC: Yes, sir.

MJ: It is different because [you] charged it under [Article] 134, clause 1 or 2.

After the members returned, the military judge provided preliminary instructions, including the definition of child pornography, with minor defined as a "real person under the age of 16." Trial counsel, Capt Maya, proceeded with her opening statement, making the following statement to the members regarding the actions of the investigator in the case:

But at this point all she had was that IP address. She didn't know who was behind the IP address so she sent a subpoena off and she found out that this IP address was registered to a Danielle Salyer who lived at [address].

Emphasis added. This was an obvious reference to PE 5, which had been excluded. With apparent frustration, the military

judge addressed trial counsel outside the presence of the

members:

MJ:   Stop, stop, stop.  I specifically excluded that piece
      of evidence.  How are you going to get it in?

TC:   Effect on listener, sir.  It is the reason -- it is
      part of the investigation that is --

MJ:   Okay, I am not going to allow that in.

TC:   But, it wouldn't be for the truth of --

MJ:   It is not coming in.  That is a piece of evidence that
      ties the accused.

TC:   And the government would be amenable --

MJ:   No --

TC:   -- to a limiting instruction if we couldn't get some
      sort of --

MJ:   Well, it's either going to be a mistrial if you don't
      get it in somewhere else.

TC:   Sir, the --

MJ:   Just listen.  That is my ruling.  We aren't going to
      address that.

TC:   Yes, sir.

. . . .

MJ:   I've considered your argument on the effect on the
      listener and I am not allowing it.

After this ruling, the Court recessed.  Capt Schweig, the

military justice officer, later testified that he and unnamed

others met and discussed the military judge's ruling on the

definition of a minor.  According to Capt Schweig, Capt Maya

told him of rumors that "Lieutenant Colonel Mori may have had a young wife." This prompted Capt Schweig to access LtCol Mori's official personnel record. According to Capt Schweig, this record indicated that LtCol Mori had been married for ten years and that his wife "was most likely 17 years old or maybe a little bit more at the time they were married." Capt Schweig further testified that, "The sole basis was an attempt to determine if there was any possible source of bias inherent in the judge's ruling." According to this same testimony, having retrieved the information from LtCol Mori's personnel record, Capt Schweig went to see LtCol Mannle, Officer-in-Charge (OIC) of the base Legal Services Center. They discussed the military judge's decision to use age sixteen vice age eighteen to define a minor for purposes of the charged child pornography offenses.

LtCol Mannle testified that he was "perplexed" by the military judge's decision. When Capt Schweig showed him the information from LtCol Mori's personnel record, LtCol Mannle concluded that:

> there was a relevant issue for the government that suggested bias on the part of the judge . . . . It struck me that this was a vital issue for voir dire, and, likely, a motion for recusal. And I thought that there was probably a better than likely chance that the judge would recuse himself.

LtCol Mannle then decided to call Captain Berger, the circuit military judge and LtCol Mori's immediate supervisor.

According to LtCol Mannle, he "owed the circuit judge a
professional courtesy to let him know that a significant event
was about to happen here."  However, LtCol Mannle later
testified that the call with Captain Berger included discussion
of the ruling on the age issue and the information regarding
LtCol Mori's wife:

> I let him know that I was unsure about why it is the
> instruction had been given.  And, again, I relayed to him
> the information that I had about the date -- or the age at
> which Lieutenant Colonel Mori married his spouse -- or her
> age at the time of the marriage.  I articulated for him in
> my heads up what it is, why it is I thought that there was
> -- there were grounds for voir dire of the judge.

When the parties returned on the record that afternoon,
Capt Maya requested voir dire of the military judge.  Among
other things, she asked the military judge how old his wife was
when they married.  The military judge answered that his wife
was seventeen.  At this point, Capt Maya offered the excerpt
from the military judge's official personnel file as an
appellate exhibit for the record.  Trial counsel then moved to
disqualify the military judge for actual and implied bias
stating:

> TC:  Specifically, the reason is because the military judge
>      instructed the court over a government objection that
>      the definition of a minor is any individual under the
>      age of 16.  This is in direct conflict with the plain
>      language of the United States Code Statute that is
>      most closely analogous under United States v. Leonard.
>      Consequently, the government questions the military
>      judge's impartiality to make rulings on this
>      instruction.

MJ:  Okay.

TC:  And the government also believes that a reasonable
     member of the public with knowledge that these facts
     and circumstances would also question the impartiality
     of the tribunal in this case.

MJ:  Okay.  Any other basis?

TC:  That is it, sir.

The military judge put the court in recess indicating that he
would return with a ruling on the motion.

The following morning, November 16, 2011, the military
judge convened an Article 39(a) session and informed the parties
of a conversation he had with Captain Berger the previous day:

MJ:  Okay.  So during our lunch recess yesterday . . . I
     called Captain Berger to speak to him about an
     evidentiary issue in this case that I had yet to rule
     on.  Captain Berger inquired [of] me what was going on
     with some age issue in the case that I was hearing, as
     he had heard by Lieutenant Colonel Mannle, the SJA for
     Marine Corps Base Hawaii and the OIC of the law center
     who had been sitting in during the proceedings for
     some of the sessions, that Lieutenant Colonel Mannle
     was not happy with my ruling that I was defining a
     minor as a person under the age 16.  And he indicated
     the government was going to seek my recusal based on
     my wife being 17 when I married her.  So I disclosed
     that to both sides.

Trial counsel responded by asking the military judge several
additional questions:

TC:  Sir, did the -- the circuit judge express his
     displeasure in any of your decisions?

MJ:  I would say I interpreted his questioning of me to
     raise concern with my performance.

TC:  And, sir, an additional voir dire question.

13

MJ:   Yes.

TC:   Previously have you disqualified any of the trial counsel on any other case?

MJ:   Have I ever disqualified a trial counsel?

TC:   Yes, sir.

MJ:   Not that I recall.  I think there was a potential issue, a potential remedy potentially on one case . . . but I can't recall.

TC:   United States versus Lauer, sir.

. . . .

TC:   All the trial counsel and the military justice officer.

MJ:   Oh, yes, that's right . . . .

. . . .

TC:   But that was something you had done in the past was disqualify --

MJ:   Okay.

TC:   And myself, specifically.

MJ:   Okay.  Any other questions?

The court recessed.  Later that afternoon the military judge convened another Article 39(a) session.  He announced that he was disqualifying himself from the case and attached his written ruling to the record.  The ruling cites LtCol Mannle's phone call to Captain Berger and the trial counsel's reference to his wife's age at the time of their marriage.  LtCol Mori's

ruling also addressed the propriety of LtCol Mannle's call to

Captain Berger:

> This court finds that a reasonable person would question the [impartiality] of the military judge on any decision in further proceedings in the case under these facts. . . . These types of questions are reasonable even from a person[] who knows all the facts. Included in those known facts are the appropriate means for members of the prosecution to address disagreements or concerns with a military judge's ruling. The appropriate means are to seek disqualification, if raised, seek reconsideration of a military judge's ruling or to file an interlocutory appeal; having the trial counsel's supervisor call the military judge's supervisor during trial is not contemplated in the rules for courts-martial. The fact that an inappropriate method for addressing a disagreement with the military judge's ruling was employed during the merits of the court-martial weighs in favor of a finding[] that a reasonable person might question the military judge's impartiality.

LtCol Mori concluded his ruling as follows:

> Any ruling made by the [military] judge against or for either side might reasonably be questioned, "Is the judge ruling in favor of the prosecution so [as to] avoid any more complaints to his boss?" or "Is the military judge ruling in favor of the defense to retaliate against the prosecution for their improper complaint to the circuit military judge?"

With respect to the prosecution's references to his wife, the

military judge continued:

> The court finds that this is also a basis for disqualification under the objective standard; not due to the fact of the military judge's wife's age, but due to the fact that the prosecution raised an issue involving a personal family matter of the military judge which was also raised with the military judge's supervisor as part of the complaint. Even though it is almost ten years and three children later, it is in relation to a personal family matter which might cause a reasonable person to question the military judge[']s [impartiality].

Colonel (Col) Richardson replaced LtCol Mori as military judge the following morning. At the Government's request, Col Richardson addressed a motion to reconsider LtCol Mori's rulings on the age of a minor and marital privilege concerning Appellant's statement to his wife regarding the missing computer. On the definition of a minor, Col Richardson ruled that he was not going to reconsider any of LtCol Mori's rulings that could be characterized as "defense friendly." Notwithstanding this statement, Col Richardson reconsidered LtCol Mori's prior ruling that Appellant's statement to his wife regarding the laptop was a confidential communication. After hearing evidence and arguments, he ruled that while some parts of the conversation were privileged, the communication regarding the destruction of the computer was not intended to be confidential and therefore, was not privileged.

Col Richardson also addressed a defense motion to dismiss for unlawful command influence. During the hearing on the motion, Col Richardson heard testimony from LtCol Mannle and Capt Schweig. After hearing from LtCol Mannle, Col Richardson excused him stating, "Given the fact that you are now a percipient witness . . . I'm going to direct that you cannot come back into the courtroom for the remainder of these proceedings." Ultimately, Col Richardson concluded that LtCol

Mannle's call to Captain Berger was "well intentioned," but nonetheless raised the appearance of unlawful influence.[6]

Regarding the intrusion into the military judge's personnel record and the subsequent voir dire into LtCol Mori's wife's age, Col Richardson found neither actual nor apparent unlawful influence regarding trial counsel's actions. He concluded that "[t]he MJ's statistically anomalous personal situation in this regard, vis-a-vis his sua sponte raising the age issue and then ruling quickly and curtly in the defense's favor was a perfectly valid basis for the Government to voir dire and challenge the MJ" and, that "the Government was well within [its] rights based on these facts to inquire into the matter."

Col Richardson's remedy for the apparent unlawful influence he found was his earlier statement that he would not reconsider any of LtCol Mori's "defense friendly" rulings. While considering potential remedies for the finding of apparent unlawful influence, Col Richardson referred to his earlier exclusion of LtCol Mannle from the courtroom stating:

> I only have several remedies available to me in UCI. I can dismiss it outright, I cannot allow Lieutenant Colonel Mannle back into the courtroom -- which we've already done anyway -- or I can ensure that, as a result of what's happened here, that the accused is not placed in any worse

---

[6] The replacement military judge, Col Richardson, specifically found that, "Such a courtesy call is widely accepted practice in the military, especially when dealing with such a sensitive topic involving a high ranking officer."

position than he possibly could have been had Lieutenant Colonel Mori continued with this trial.

DISCUSSION

I.

Article 37, UCMJ,[7] states "No person subject to [the UCMJ] may attempt to coerce or, by any unauthorized means, influence the action of a court-martial . . . or any member thereof . . . ." While statutory in form, the prohibition can also raise due process concerns, where for example unlawful influence undermines a defendant's right to a fair trial or the opportunity to put on a defense.

Allegations of unlawful command influence are reviewed de novo. United States v. Harvey, 64 M.J. 13, 19 (C.A.A.F. 2006); United States v. Villareal, 52 M.J. 27, 30 (C.A.A.F. 1999); United States v. Wallace, 39 M.J. 284, 286 (C.M.A. 1994). On appeal, the accused bears the initial burden of raising unlawful command influence. Appellant must show: (1) facts, which if true, constitute unlawful command influence; (2) that the proceedings were unfair; and (3) that the unlawful command influence was the cause of the unfairness. United States v. Richter, 51 M.J. 213, 224 (C.A.A.F. 1999) (quoting Biagase, 50 M.J. at 143, 150 (C.A.A.F. 1999)). Thus, the initial burden of showing potential unlawful command influence is low, but is more

---

[7] 10 U.S.C. § 837 (2006).

than mere allegation or speculation.  United States v. Stoneman, 57 M.J. 35, 41 (C.A.A.F. 2002).  The quantum of evidence required to raise unlawful command influence is "some evidence." Stoneman, 57 M.J. at 41 (quoting Biagase, 50 M.J. at 150) (internal quotation marks omitted).

Once an issue of unlawful command influence is raised by some evidence, the burden shifts to the government to rebut an allegation of unlawful command influence by persuading the Court beyond a reasonable doubt that (1) the predicate facts do not exist; (2) the facts do not constitute unlawful command influence; or (3) the unlawful command influence did not affect the findings or sentence.  Biagase, 50 M.J. at 151.

Allegations of unlawful command influence are reviewed for actual unlawful command influence as well the appearance of unlawful command influence.  "Even if there was no actual unlawful command influence, there may be a question whether the influence of command placed an 'intolerable strain on public perception of the military justice system.'"  United States v. Lewis, 63 M.J. 405, 415 (C.A.A.F. 2006) (citation and internal quotation marks omitted); Stoneman, 57 M.J. at 42–43 (quoting United States v. Wiesen, 56 M.J. 172, 175 (C.A.A.F. 2001)).  The test for the appearance of unlawful influence is objective.  "We focus upon the perception of fairness in the military justice system as viewed through the eyes of a reasonable member of the

19

public." Lewis, 63 M.J. at 415. An appearance of unlawful command influence arises "where an objective, disinterested observer, fully informed of all the facts and circumstances, would harbor a significant doubt about the fairness of the proceeding." Id.

In this case, the CCA upheld Col Richardson's conclusion that the call to Captain Berger raised the appearance of unlawful influence, but not actual unlawful influence. Salyer, 2012 CCA LEXIS 407, at *15, 2012 WL 5208620, at *6 (unpublished). The CCA further concluded, as Col Richardson did, that the voir dire of LtCol Mori raised neither actual unlawful influence nor an appearance of unlawful influence. 2012 CCA LEXIS 407, at *18, 2012 WL 5208620, at *7. The CCA specifically concluded that there was "a good faith basis to inquire into the military judge's personal life." 2012 CCA LEXIS 407, at *16, 2012 WL 5208620, at *6. Here, the fact is undisputed that, in the words of the CCA, "LtCol MDM did marry a 17-year-old woman. The Government had verified this fact before commencing its voir dire into how that fact might have influenced LtCol MDM's pretrial ruling on the definition of a minor." 2012 CCA LEXIS 407, at *16, 2012 WL 5208620, at *6.

Reviewing the case de novo, we disagree with the lower court's analysis, reasoning, and conclusion regarding the appearance of unlawful command influence.

II.

Our review of unlawful influence in a given case is not limited to actual influence.  Lewis, 63 M.J. at 415.  This Court is concerned not only with eliminating actual unlawful influence, but also with "eliminating even the appearance of unlawful command influence at courts-martial."  United States v. Rosser, 6 M.J. 267, 271 (C.M.A. 1979).[8]  Our analysis begins by again taking notice, as we did in Lewis, that military judges in the Navy and Marine Corps trial judiciary are selected by the Judge Advocate General of the Navy:

> Authority to detail military judges has been delegated to service secretaries.  Article 26(a), UCMJ, 10 U.S.C. § 826(a) (2000).  The Secretary of the Navy has further delegated that authority to the Judge Advocate General who has prescribed that military judges will be detailed by and from a standing judiciary.  See Dep't of the Navy, Judge Advocate General Instr. 5800.7D, Manual of the Judge Advocate General (JAGMAN) para. 0130a.(1) (Mar. 15, 2004); Dep't of the Navy, Judge Advocate General Instr. 5813.4G, Navy-Marine Corps Trial Judiciary para. 6 (Feb. 10, 2006).  In addition, military judges of general courts-martial are "designated by" and "directly responsible to" the Judge Advocate General of the service.

---

[8] As a threshold matter, we reject the Government's argument that the law of the case doctrine limits our review to simply whether Col Richardson took sufficient steps to cure the apparent unlawful command influence from the OIC's phone call.  Brief for Appellee at 13, United States v. Salyer, No. 13-0186 (C.A.A.F. Mar. 21, 2013).  In our view, the granted issue covers all of the Government's conduct surrounding the phone call and the motion to recuse, including the retrieval of the military judge's personal information and the subsequent voir dire. Furthermore, Appellant's position at trial and in the lower court included the complete range of conduct and issues leading to the recusal of the original military judge.

Lewis, 63 M.J. at 413-14.

The Judge Advocate General's (JAG) regulations indicate that the selection and certification of a military judge is based on "governing criteria." Dep't of the Navy, Judge Advocate General Instr. 5813.4I, Navy-Marine Corps Trial Judiciary para. 5.b.(1) (Sept. 9, 2011) [hereinafter JAGINST 5813.4I].[9] In appointing a military judge, the JAG acknowledges that the individual meets these criteria and is fit for office. Individual military trial judges in the Marine Corps subsequently report to circuit trial judges who evaluate their performance and assign their cases. Id. at para. 4.d. Military judges do not serve terms of office, but rather, generally serve unless or until an appropriate reason for reassignment arises. Id. at paras. 5.a., 5.b. As a result:

> Neither the government nor the defense at a court-martial is vested with the power to designate, detail, or select the military judge. Conversely, neither party can usurp the authority of the service secretaries or Judge Advocates General by removing or unseating properly certified and detailed military judges.

Lewis, 63 M.J. at 414.

We also note again, as we did in Lewis, that a military judge "shall perform the duties of judicial office impartially and fairly." Id. (citation and internal quotation marks

---

[9] Navy and Marine Corps judicial nominees are recommended for appointment by the Judicial Screening Board. JAGINST 5813.4I, at para. 5.b.(1).

22

omitted).  Toward this end, a military judge, like other judges, is required to affirmatively recuse himself, sua sponte, from a case where there is a ground for disqualification.  Rule for Courts-Martial (R.C.M.) 902(b).  Both parties to the trial are also "permitted to question the military judge and to present evidence regarding a possible ground for disqualification."  R.C.M. 902(d)(2).[10]  This rule lists possible grounds for

---

[10] Possible grounds for disqualification include:

(1)  Where the military judge has a personal bias or prejudice concerning a party or personal knowledge of disputed evidentiary facts concerning the proceeding.

(2)  Where the military judge has acted as counsel, investigating officer, legal officer, staff judge advocate, or convening authority as to any offense charged or in the same case generally.

(3)  Where the military judge has been or will be a witness in the same case, is the accuser, has forwarded charges in the case with a personal recommendation as to disposition, or, except in the performance of duties as a military judge in a previous trial of the same or related case, has expressed an opinion concerning the guilt or innocence of the accused.

(4)  Where the military judge is not eligible to act because the military judge is not qualified under R.C.M. 502(c) or not detailed under R.C.M. 503(b).

(5)  Where the military judge, the military judge's spouse[:]

(A)  Is a party to the proceeding;

(B)  Is known by the military judge to have an interest, financial or otherwise, that could be substantially affected by the outcome of the proceeding; or

23

disqualification including "personal bias" on the part of a military judge. However, where there is evidence in the record of an effort to unseat a military judge based on the trial counsel's animosity toward the military judge, to secure a more favorable ruling, or to cause the assignment of an alternative military judge, where the presiding military judge is otherwise qualified to serve, an appearance of unlawful command influence is raised. See Lewis, 63 M.J. at 414.

Six facts of record considered together raise some evidence of the appearance of unlawful influence in this case. First, the military judge made a number of rulings adverse to the Government as set out earlier in this opinion. One of these rulings dealt with the age definition of a minor for the purpose of defining child pornography charged under Article 134(2), UCMJ. The Government chose to charge the allegations as military offenses under Article 134, clause 2, UCMJ, by removing specific references to Title 18. Moreover, the original specifications in this case do not allege any specific number of images possessed or distributed. Thus, at most, the prosecution was required to prove possession and distribution of at least two images relevant to each specification. Prosecution Exhibit

---

(C)  Is to the military judge's knowledge likely to be a material witness in the proceeding.

R.C.M. 902(b).

1 (PE 1) is a compact disc containing forty-three images. Prosecution Exhibit 2 (PE 2) appears to be twenty or so printed images, presumably representative of the forty-three images on PE 1. Although it might be reasonably debated whether some of the subjects in the images contained in PE 2 are under the age of eighteen, eight to ten of these images depict subjects who are clearly under sixteen, and some appear to be under the age of ten. Thus, the military judge's ruling that a minor would be defined as a person under the age of sixteen does not itself appear so critical as to explain the Government's extraordinary efforts to seek recusal.

Second, in response to what is described by the Government and the CCA as a rumor conveyed by trial counsel, the military justice officer obtained access to the military judge's official personnel file to determine the age of the military judge's wife at the time she married the military judge. This marriage occurred ten years prior to Appellant's trial. Trial counsel made no logical nexus between the wife's age at marriage and the ruling regarding the age of a minor. Further, there is a considerable difference between marrying a seventeen-year-old, an act sanctioned by law, and possession of child pornography. The CCA found that the convening authority and his staff judge advocate were not aware of, and thus, did not direct, the actions in this case. 2012 CCA LEXIS 407, at *15-*16, 2012 WL

5208620, at *6.  Albeit not members of the convening authority's command, the OIC of the law center and the trial counsel were, however, representatives of the Government.

Third, the OIC telephoned the circuit trial judge to alert him that the Government would seek disqualification of the military judge in Appellant's court-martial.  This call was characterized by Col Richardson as a well-intended courtesy call.[11]  However, in the course of this conversation the OIC also conveyed his dissatisfaction with the military judge's ruling on the age issue, and this call occurred during an ongoing court-martial.  The circuit trial judge was the judicial supervisor of the military judge hearing Appellant's case at the time the call was made.

Fourth, trial counsel used the personal information from the military judge's official personnel file in support of a motion to disqualify the military judge on the ground of actual and implied bias.

Fifth, in the course of arguing this motion, trial counsel asked the military judge whether he had ever disqualified any trial counsel in any case.  The military judge answered, "Not that I recall."  Trial counsel then raised a specific court-

---

[11] Whether this conclusion is most appropriately cast as a finding of fact or a conclusion ultimately does not matter. Accepting the accuracy of the conclusion, the fact remains that the OIC made the call during an ongoing court-martial and took issue with the military judge's ruling in the process.

martial unrelated to Appellant's in which the sitting military judge had disqualified the same trial counsel appearing in this case.

Sixth, the military judge removed himself from the case for two reasons. First, the military judge found that a reasonable person would question his impartiality because of the OIC's call complaining to the military judge's reporting senior. Second, the military judge also found that a basis for disqualification arose "due to the fact that the prosecution raised an issue involving a personal family matter . . . which was also raised with the military judge's supervisor as part of the complaint."

The analysis of the lower court fails to address two essential points. First, while the Government, like the defense, is "permitted to question the military judge . . . regarding a possible ground for disqualification," it is the manner in which and the means by which the Government went about doing so that raises the appearance of unlawful command influence, not the fact of inquiry. R.C.M. 902(d)(2). The normative method for addressing potential issues of disqualification is voir dire. R.C.M. 902 provides the substantive framework and R.C.M. 802 provides a procedural vehicle. Accessing a military judge's official personnel file to verify rumors regarding his family is not a normative method for testing and validating the impartiality of a military judge;

27

it is not sanctioned by the UCMJ.  Thus, even if one assumes and accepts the replacement military judge's finding of good faith for inquiring into the first military judge's background, a good-faith basis of inquiry under R.C.M. 902 does not create a correlating good-faith basis to access a military judge's official personnel file without his consent in search of personal matters with which to question and challenge the military judge.  Such access, were it condoned by appellate courts, would strike at the heart and soul of an independent military judiciary.

Second, the normative method for challenging a military judge's legal ruling is to seek an appeal of that ruling.  This might be done on an interlocutory basis, and generally the appeal will be given precedence by the CCA and by this Court. See generally Article 62(b), UCMJ, 10 U.S.C. § 862(b) (2006).[12] The normative method for addressing a military judge's substantive ruling is not to seek a military judge's disqualification and get a new ruling from a replacement military judge.  And, it is not to have the Government communicate in an ex parte manner with the military judge's judicial supervisor and express displeasure with the ruling.

---

[12] However, we make no judgments as to whether such an appeal would have satisfied the requirements of Article 62(b), UCMJ, or as to the potential success or failure of such an appeal in this case.

The appearance of unlawful influence is raised because the Government used its custody of the military judge's official personnel file to search that personnel file to find personal family information for the purpose of challenging the military judge for bias. Further, the Government expressed its displeasure with the military judge's rulings not only on the record but in an ex parte manner to the trial judge's judicial supervisor during the pendency of the court-martial and while the military judge was still presiding. Trial counsel stated that these actions were taken in response to the military judge's ruling on the age of a minor for an Article 134, UCMJ, child pornography charge. However, this issue was not central to the Appellant's case as there appears to have been ample evidence for the prosecution to proceed regarding the images at issue and the Government did not attempt to appeal the ruling on an interlocutory basis. More importantly, the Government at trial and on appeal failed to indicate how and why the military judge's lawful marriage ten years earlier was relevant to the substantive validity of his ruling on the age issue.[13]

---

[13] Regarding LtCol Mori's marriage, the replacement military judge stated on the record that, "I don't know that marrying a 17-year-old woman could affect somebody's career in any way, shape, or form. And I don't believe that that is a proper consideration. It was a legal marriage." Furthermore, the issue of the age of a minor for the purpose of defining child pornography under clauses 1 or 2 of Article 134, UCMJ, is an open legal question that has yet to be resolved by this Court.

Thus, there is the appearance in this record that the Government sought, through inappropriate means, disqualification of the military judge because it did not agree with the military judge's ruling. An objective, disinterested observer, fully informed of these facts and circumstances, might well be left with the impression that the prosecution in a military trial has the power to manipulate which military judge presides in a given case depending on whether the military judge is viewed as favorable or unfavorable to the prosecution's cause based on the Government's access to a military judge's personnel file and through access to the military judge's chain of command. This, in our view, would foster the "intolerable strain on public perception" of the military justice system which the proscription against unlawful command influence and this Court guard against.

## III.

Having found an appearance of unlawful command influence, we now test for prejudice. This question hinges in part on whether the remedial measures taken by the replacement military judge were sufficient to cleanse Appellant's trial of any effect from the Government's conduct in the course of causing the disqualification of the original trial judge.[14] However the

---

[14] As noted earlier, the Government's position in this Court is that the granted issue limits our consideration to the finding

ultimate question is whether the Government has convinced us beyond a reasonable doubt that "the disinterested public would now believe that [Appellant] received a trial free from the effects of unlawful command influence." Lewis, 63 M.J. at 415.

Col Richardson indicated he would let stand any prior rulings characterized as "defense friendly." Although it is unclear whether Col Richardson also considered his exclusion of LtCol Mannle as part of the remedy for the finding of apparent unlawful influence, Appellant, nonetheless, argues that Col Richardson could have done more by excluding LtCol Mannle and trial counsel from any further participation in Appellant's court-martial.

A sometime problem with an effects-based prejudice test is that one cannot ultimately know what would have happened differently had the original military judge remained on the case. All change has some effect. What we do know is the first military judge left open his ruling on the marital privilege issue. He found the privilege applied, but he had not yet ruled on the waiver issue.

We are not convinced beyond a reasonable doubt that the Government has met its burden of demonstrating this case

by Col Richardson and the court below that LtCol Mannle's call to Captain Berger raised the appearance of unlawful influence. The Government concedes that such an appearance is raised and argues only that this appearance of unlawful influence had no prejudicial impact on the court-martial.

31

proceeded free from the appearance of unlawful influence. Assuming for the sake of argument that the exclusion of LtCol Mannle from the courtroom can be considered part of Col Richardson's remedial effort, it had uncertain effect since the trial counsel, over whom LtCol Mannle continued to exercise supervisory authority, remained on the case. Neither is it clear whether LtCol Mannle, who was now a witness in the case, was barred from participating further in the proceedings from outside the courtroom. The CCA appears to have found that he was barred "from any further participation in the proceedings." 2012 CCA LEXIS 407, at *19, 2012 WL 5208620, at *7. However, the military judge never stated that he was precluded from participating outside the courtroom -- only that he was barred from the courtroom. Here, the burden is important; we do not know whether LtCol Mannle played any further role in advising on the case, which is a consideration the Government, under Biagase, carried the burden to address on appeal.

Secondly, Col Richardson's ruling on the marital privilege issue was at best inconsistent with his earlier decision to not reconsider any previous "defense friendly" rulings made by the original military judge. Unlike the first military judge, the replacement military judge found that the marital privilege did not apply to the communications in question. We cannot know how the first military judge would ultimately have ruled, but we do

know that the replacement military judge ruled against Appellant on this issue.

As a result, an objective member of the public would be left with the appearance and the impression that the Government obtained advantage from its actions -- a new military judge and a more favorable ruling on privilege. Moreover, the same persons who had accessed the military judge's official file and made ex parte contact with the first military judge's supervisor were not barred from further participation in the case. Based on these facts the Government has not met its burden beyond a reasonable doubt of demonstrating that the appearance of unlawful influence was fully ameliorated in this case.

IV.

We turn now to the question of remedy. Appellant cites Lewis in arguing for dismissal with prejudice. The Government argues, as the CCA concluded, that dismissal with prejudice would be too harsh a remedy.

As in Lewis, the unprofessional actions of the Government improperly succeeded in getting the military judge to recuse himself from Appellant's court martial. 63 M.J. at 412. Whether the Government's primary motive was to remove a properly detailed military judge from the case through inappropriate means or not, it had that effect. Were we to authorize a rehearing, the Government would obtain the result it sought to

obtain through inappropriate means -- a trial with a different military judge. Thus, any remedy short of dismissal at this stage would effectively validate the Government's actions. In addition, a rehearing as a remedy would occur over two-and-a-half years after Appellant's original court-martial. Appellant had a right to a timely trial before a military judge who had been properly detailed to hear the case. Through no fault of his own, Appellant was denied this right as a result of the Government's inappropriate actions causing the disqualification of a military judge.[15] Finally, the actions at issue strike at the heart of what it means to have an independent military judiciary and indeed a credible military justice system. Consequently, on the specific facts of this case, setting aside the finding and sentence to allow a retrial would leave Appellant where the appellant in Lewis found himself, "from an objective standpoint, the Government has accomplished its desired end and suffered no detriment or sanction for its actions." Id. at 416.

## DECISION

The decision of the United States Navy-Marine Corps Court of Criminal Appeals is reversed. The finding of guilty and the

---

[15] We do not suggest that Appellant had a right to this or any other individual military judge, but he did have a right to have the military judge detailed to the case be free from inappropriate attempts to remove him.

sentence are dismissed with prejudice.  The record of trial is returned to the Judge Advocate General of the Navy.

United States v. Salyer, No. 13-0186/MC

RYAN, Judge, with whom COX, Senior Judge, joins (dissenting):

I agree with the majority that whether the command has unlawfully influenced a court-martial is a question of law that we review de novo. See United States v. Salyer, __ M.J. __ (18) (C.A.A.F. 2013). I dissent, however, for two reasons.

First, the facts that inform this legal question "are reviewed under a clearly erroneous standard." United States v. Villareal, 52 M.J. 27, 30 (C.A.A.F. 1999). And where a military judge makes "detailed findings of fact[] and these findings are clearly supported by the record," we adopt them into our de novo analysis. Id. Nonetheless, the majority effectively ignores the military judge's findings of fact and suggests, without explicitly holding, that the Government's actions in this case amounted to an unlawful effort to unseat a military judge. See Salyer, __ M.J. at __ (24-30).

Second, because there is no showing that Appellant actually received an unfair trial, the majority must rely on the doctrine of apparent unlawful command influence to reach its remedy of choice in this case -- dismissal with prejudice. This is highly problematic. "We grant a military judge broad discretion in crafting a remedy to remove the taint of unlawful command influence, and we will not reverse 'so long as the decision remains within that range.'" United States v. Douglas, 68 M.J.

349, 354 (C.A.A.F. 2010) (quoting United States v. Gore, 60 M.J. 178, 187 (C.A.A.F. 2004)). Furthermore, "[w]e have looked with favor on military judges taking proactive, curative steps to remove the taint of unlawful command influence," and noted that dismissal is a remedy of "last resort." Id. at 354. This Court has repeatedly emphasized that dismissal "is a drastic remedy and courts must look to see whether alternative remedies are available." Gore, 60 M.J. at 187.

Contrary to this well-established precept of law, the majority discounts the curative steps undertaken by Colonel (Col) Richardson, the replacement military judge, and dismisses this case with prejudice. But prescribing such a drastic remedy amounts to an unwarranted windfall where, due to the curative measures undertaken by Col Richardson, Appellant cannot show that the Government's actions caused him to receive an unfair trial or that "a reasonable observer would have significant doubt about the fairness of [his] court-martial." United States v. Lewis, 63 M.J. 405, 415 (C.A.A.F. 2006). The mere fact that the Government's conduct had the "effect" of leading the initial military judge to recuse himself, without more, should not compel us to dismiss the charges with prejudice. But see Salyer, __ M.J. at __ (33-34).

Here, Col Richardson decided, after hearing testimony from multiple witnesses and the parties' arguments, to remedy the

2

appearance of unlawful command influence by corrective action other than dismissal -- a decision based on detailed findings of fact that were supported by evidence in the record.  Because "there was no abuse of discretion in the type of corrective action decided upon by [Col Richardson]," Douglas, 68 M.J. at 354, and, indeed, the corrective action removed the taint of apparent unlawful command influence from Appellant's court-martial, id., I would affirm the decision of the United States Navy-Marine Corps Court of Criminal Appeals (NMCCA).  To hold otherwise fails to accord proper deference to Col Richardson's factual determinations and implies that a defendant is entitled to a particular military judge,[1] such that there can be no cure -- save for dismissing the charges with prejudice -- when a military judge recuses himself during a proceeding.  That neither is nor should be the law.

---

[1] No one disagrees that "Appellant had a right to a timely trial before a military judge who had been properly detailed to hear the case," see Salyer, __ M.J. at __ (34), but this does not include the right to a particular military judge, and it is altogether unclear how Col Richardson somehow failed, under the circumstances of this case and in the eyes of an objective, reasonable, and fully informed member of the public, to protect Appellant's rights to a fair trial or how the Government gained an advantage from him serving as the replacement military judge. Likewise, if the right at issue is characterized as Appellant's "right to have the military judge detailed to the case be free from inappropriate attempts to remove him," id. at __ (34 n.15), to conclude that this right was violated, once more, requires one to ignore the contrary findings of the military judge who presided at the unlawful command influence motion hearing.

A.

The events that gave rise to Appellant's allegation of unlawful command influence are as follows:  (1) after Lieutenant Colonel (LtCol) Mori ruled that a "minor" was defined as a child under the age of sixteen, instead of under the age of eighteen as defined in the federal child pornography statute, the Government looked at LtCol Mori's personnel file to confirm a rumor that LtCol Mori had a "very young wife"; (2) the Officer-in-Charge (OIC) made a phone call to the Circuit Military Judge of the Western Pacific Judicial Circuit (CMJ), who was LtCol Mori's immediate supervisor, informing him that the Government was planning to voir dire LtCol Mori on this personal matter and move for his disqualification; (3) when LtCol Mori called the CMJ to speak with him about an unrelated evidentiary matter, the CMJ informed him of the OIC's phone call; and (4) the Government voir dired LtCol Mori on the age of his wife and moved for his disqualification.

Ultimately, LtCol Mori recused himself and was replaced by Col Richardson.  The defense filed a motion to dismiss for unlawful command influence and a hearing was held.  At the hearing several witnesses testified as to the events that formed the basis of the alleged unlawful command influence.  The military justice officer (MJO) testified that he was "prompted . . . to pull up [LtCol] Mori's [personnel file]"

4

because "the government was looking for some reason why [LtCol] Mori" had defined "minor" as under the age of sixteen, and someone in the prosecutor's office had mentioned that LtCol Mori had a "very young wife." He further stated that there was "absolutely no intent to embarrass the military judge. . . . [t]he sole purpose [was] to attempt to figure out if there were any outside influences in his decision."

Additionally, the OIC testified at length as to his reasons for calling the CMJ. Along with trial counsel and the MJO, the OIC was "perplexed by" LtCol Mori's ruling as to the definition of "minor." When the MJO showed him LtCol Mori's personnel file, which indicated that his wife was seventeen years of age at the time they wed, the OIC believed "at that point there was a relevant issue for the government that suggested bias on the part of [LtCol Mori]." He further testified that, in light of the personal nature of the issue on which LtCol was to be voir dired and the fact that the trial was under way, he "owed the [CMJ] a professional courtesy to let him know that a significant event was about to happen." When asked by defense counsel whether his intent in calling the CMJ was to have LtCol Mori reverse his decision, the OIC stated that "it was not."

Consistent with the evidence produced at the hearing, Col Richardson made the following findings: (1) the OIC's phone call to the CMJ was "reasonably well-intentioned but nonetheless

[an] unwise decision"; (2) it was "an appearance problem when that phone call [led] to a series of actions resulting in the military judge finding himself in a position where he does not feel like he can continue in the trial"; and (3) "the government had a good-faith basis for the question that they asked of [LtCol] Mori, that it was logically connected to a possible bias in the case."

Applying the law to these findings, Col Richardson concluded that (1) "the Government was well within [its] rights based on these facts to inquire" into the age of LtCol Mori's wife at the time they wed, but (2) the OIC's phone call to the CMJ and the subsequent recusal of LtCol Mori created the appearance of unlawful command influence. As a remedy for the apparent unlawful command influence, Col Richardson refused to reconsider any of LtCol Mori's "defense friendly" rulings. Appellant did not seek any additional remedies.

B.

Where a court-martial has been unlawfully influenced, we review a military judge's choice of remedy for an abuse of discretion. Douglas, 68 M.J. at 354. An abuse of discretion means that "'when judicial action is taken in a discretionary matter, such action cannot be set aside by a reviewing court unless it has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it

6

reached upon a weighing of the relevant factors.'" Gore, 60 M.J. at 187 (quoting United States v. Houser, 36 M.J. 392, 397 (C.M.A. 1993)). "This Court has recognized that 'a military judge can intervene and protect a court-martial from the effects of unlawful command influence.'" Douglas, 68 M.J. at 354 (quoting United States v. Biagase, 50 M.J. 143, 152 (C.A.A.F. 1999)). We grant a military judge broad discretion in crafting a remedy to remove the taint of unlawful command influence, and this Court has repeatedly emphasized that dismissal "is a drastic remedy and courts must look to see whether alternative remedies are available." Gore, 60 M.J. at 187.

Here, based on detailed findings of fact that were supported by the record, Col Richardson crafted a "specifically tailored" remedy "aimed at ameliorating the effects of [the unlawful command influence]," Douglas, 68 M.J. at 355, to which defense counsel did not object or request the addition of further remedial measures. In doing so, he exercised reasonable discretion, see id., and his decision should not be disturbed unless this Court "'has a definite and firm conviction'" that he "'committed a clear error of judgment,'" Gore, 60 M.J. at 187 (quoting Houser, 36 M.J. at 397).

Nonetheless, the majority concludes that Col Richardson's curative steps were insufficient because "any remedy short of dismissal at this stage would effectively validate the

7

Government's actions." Salyer, __ M.J. at __ (34). Ostensibly, the majority is unconcerned with "[w]hether the Government's primary motive was to remove a properly detailed military judge from the case through inappropriate means," id. at 33, yet it readily concludes that:

> [a]n objective, disinterested observer, fully informed of these facts and circumstances, might well be left with the impression that the prosecution in a military trial has the power to manipulate which military judge presides in a given case depending on whether the judge is viewed as favorable or unfavorable to the prosecution's cause

id. at __ (30), and describes the Government as "improperly succeed[ing] in getting the military judge to recuse himself from Appellant's court martial," and taking actions which "strike at the heart of what it means to have an independent military judiciary and indeed a credible military justice system." Id. at __ (33-34). Such language, when viewed in conjunction with the majority's reliance on Lewis, all but expressly holds that the Government's actions were "an effort to unseat a military judge based on the trial counsel's animosity toward the military judge, to secure a more favorable ruling, or to cause the assignment of an alternative military judge." Id. at __ (24) (citing Lewis, 63 M.J. at 414).

The problem with this view is that Col Richardson accepted the Government's representations that the call to LtCol Mori's supervisor was not motivated by a desire to get him to reverse

his ruling.  Thus, while the call was undoubtedly improper, the animus the majority attributes to it is not supported by the military judge's findings or the record.  Moreover, the majority's broad conclusion that "[t]rial counsel made no logical nexus between the wife's age at marriage and the ruling regarding the age of a minor,"[2] Salyer, __ M.J. at __ (25), is, quite simply, contradicted by both the record and Col Richardson's findings.

Even if we were authorized to make findings of fact, the record does not support the majority's vague conclusions.  There are insufficient facts on the record to determine why the Government wanted the age of a minor to be set at eighteen instead of sixteen.  Nevertheless, the majority uses this lack of a record to suggest that improper reasons must have motivated the Government to both contest the military judge's ruling and challenge the military judge for cause.  Salyer, __ M.J. at __

---

[2] Given LtCol Mori's rationale for his ruling -- that to rule otherwise would mean that it would be legal to have sexual intercourse with someone under eighteen, but illegal to take naked pictures of that person -- the fact that his wife was under eighteen years of age when they married is logically related.  See United States v. Nerad, 69 M.J. 138, 148 (C.A.A.F. 2010) (holding that the Courts of Criminal Appeals have no authority to set aside a finding of possession of child pornography, charged under clauses 1 and 2 of Article 134, UCMJ, see Nerad, 69 M.J. at 149 (Stucky, J., dissenting), based purely on equitable factors and remanding the case to determine whether the lower court had done so when it set aside the accused's findings and reasoned that the accused could have, but for his existing marriage, legally had sex with the object of the nude pictures).

(24-27).  The majority bolsters its conclusion that there was no legitimate prosecution strategy behind the Government's conduct by further finding that because the Government had sufficient evidence to convict Appellant with the lower age imposed by the military judge, the ruling was not critical to the Government's prosecution of its case.  Id. at __ (24-25).  This reasoning ignores courtroom realities by undervaluing the Government's advantage in possessing overwhelming -- vice sufficient -- proof of an offense for findings, and the import of quantum of evidence at sentencing.

Moreover, even assuming that the existence of alternative means of challenging the military judge's ruling precludes the Government from seeking recusal, it is at best dubitante whether the "normative" methods proposed by the majority were available to the Government in this case.  See id. at __ (27-28).  Whether the Government could have filed an interlocutory appeal under Article 62, UCMJ, 10 U.S.C. § 862 (2006), requesting review of LtCol Mori's decision to instruct the jury that a "minor," for purposes of the Article 134, UCMJ, clause 2, child pornography specifications, is defined as a child under the age of sixteen is questionable.  See id.  Article 62, UCMJ, authorizes government appeals of only the rulings and orders that are listed in the statute.  LtCol Mori's ruling as to the definition of a "minor" does not appear to be (1) "[a]n order or ruling

which excludes evidence that is substantial proof of a fact

material in the proceeding," Article 62(a)(1)(B), UCMJ, since,

as the majority notes, only two images of child pornography were

required for conviction and the evidence admitted under the

limitations set by LtCol Mori's ruling depicted eight to ten

images of "subjects who are clearly under sixteen, and some

appear to be under the age of ten," Salyer, __ M.J. at __ (25);

or (2) an order or ruling that otherwise falls within Article

62, UCMJ's purview.  The mere fact that recusal was sought

simply does not establish a malevolent purpose as a matter of

law, and without a malevolent purpose, there is no basis for

dismissal with prejudice.[3]

---

[3] I agree with the majority that the MJO's action in accessing
LtCol Mori's personnel record was highly improper and may even
rise to the level of an ethical violation.  However, the defense
did not deem this fact sufficiently egregious to mention it in
its motion to dismiss and only touched on it briefly at the
motion hearing.  Moreover, that the conduct may be improper does
not answer the unrelated questions whether it was motivated by
animus, as opposed to overzealousness, or whether Col Richardson
took remedial steps that addressed the improper conduct such
that Appellant received a fair trial, both in actuality and
appearance.  Cf. Smith v. Phillips, 455 U.S. 209, 220 n.10
(1982) ("Even in cases of egregious prosecutorial misconduct,
such as the knowing use of perjured testimony, we have required
a new trial only when the tainted evidence was material to the
case.  This materiality requirement implicitly recognizes that
the misconduct's effect on the trial, not the blameworthiness of
the prosecutor, is the crucial inquiry for due process
purposes." (internal citations omitted)).

C.

If, in fact, Col Richardson's findings of fact were clearly erroneous and the Government's actions could only be viewed as an "an effort to unseat a military judge based on the trial counsel's animosity toward the military judge, to secure a more favorable ruling, or to cause the assignment of an alternative military judge," Salyer, __ M.J. at __ (24), the majority's remedy would make some sense as Lewis would control. See Lewis, 63 M.J. at 414. But that is not what the majority claims to hold. Rather, it purportedly disturbs none of Col Richardson's findings with regard to the unlawful command influence motion and anemically concludes that "[w]hether the Government's primary motive was to remove a properly detailed military judge from the case through inappropriate means or not, it had that effect." Salyer, __ M.J. at __ (33).

Taking the majority at its word, and in light of its complete lack of discussion overruling Col Richardson's findings of fact, the decision to dismiss the charges with prejudice is a remarkable and unwarranted extension of Lewis, where this Court concluded that "under the unique circumstances of th[e] case" -- namely, the government having engaged in an "orchestrated effort to unseat [the military judge]" and "compelled [the military judge] to remove herself" -- the "drastic remedy" of dismissal

12

was warranted to ameliorate the resulting unlawful command influence.  Lewis, 63 M.J. at 407, 414, 416.

In Lewis, the Court held that dismissal was warranted where the staff judge advocate (SJA) and trial counsel "wanted to ensure that a given military judge, properly detailed and otherwise qualified, would not sit on Lewis's case," and, "[i]n the end, the [g]overnment achieved its goal through unlawful command influence."  63 M.J. at 416.  We noted that while both the accused and the government are "'permitted to question the military judge and to present evidence regarding a possible ground for disqualification,'" id. at 414 (quoting R.C.M. 902(d)(2)), "neither party can usurp the authority of the service secretaries or Judge Advocates General by removing or unseating properly certified and detailed military judges," id.

This Court observed that trial counsel and the SJA had done just that in conspiring together in an "orchestrated effort" to unseat the military judge.  Id.  The first replacement military judge decided to disqualify himself because he could not be impartial where "'the manner in which [trial counsel] handled the voir dire . . . offend[ed] [him]'" and "the SJA's crass, sarcastic, and scurrilous characterization of the social interaction between [the military judge] and Ms. [JS], besp[oke] an ignorance, prejudice, and paranoia on the part of the government."  Id. at 411 (first alteration in original).  The

13

government's challenge to the military judge rested on nothing more than "suggestion, innuendo," and the SJA's own "gratuitous characterization of [the military judge]'s relationship with Ms. JS," and the effort to unseat the military judge "was a continuation of an ongoing effort to remove [her] from any case in which Ms. JS served as civilian defense counsel." Id. at 414. In light of these facts, we concluded that the government "exceeded any legitimate exercise of the right conferred upon the [g]overnment to question or challenge a military judge." Id. We did not hold that the government may not challenge a military judge where it believes there is actual bias or an appearance of bias.

The facts of this case are not Lewis. Here, there is no evidence that the OIC or trial counsel had ever tried to remove LtCol Mori from a previous case or that trial counsel was acting as the OIC's "instrument in the courtroom." Id. Most importantly, although defense counsel claimed that "there was an orchestrated Government effort . . . to remove [LtCol Mori]" and characterized the Government's voir dire of LtCol Mori as "meritless," Col Richardson rejected that argument, finding that the OIC's phone call to the CMJ was "well-intentioned" and that "the Government had a well grounded factual basis for inquiring into [the age of LtCol Mori's wife when they wed]." See supra note 2.

14

Quite strangely, the majority nevertheless appears to hold that Lewis controls where the "effect" of the Government's actions is that the military judge recuses himself, regardless of whether "the Government's primary motive was to remove a properly detailed military judge from the case."  Salyer, __ M.J. at __ (33).  While reasonable minds might differ as to the motivation for the Government's conduct, such a determination is undoubtedly factual.  And while this Court should not supplant Col Richardson's findings of fact with its own simply because we would have reached a different conclusion with appellate hindsight, it certainly should not displace Col Richardson's remedies with its own extreme remedy without first holding that Col Richardson's findings of fact were clearly erroneous.  See United States v. Travers, 25 M.J. 61, 63 (C.M.A. 1987) ("[W]e will not substitute our judgment for that of the military judge who was present in the courtroom and familiar with the sense of what was happening at the time of the [events].").  The majority, however, stops short of explicitly overruling Col Richardson's findings of fact, maybe because it cannot dispute that no one was in a better position to assess the credibility and motivations of the witnesses at the hearing on unlawful command influence than Col Richardson himself.

D.

Accepting Col Richardson's factual determination that the Government had a legitimate ground for voir diring and challenging LtCol Mori's impartiality, the next question is whether LtCol Mori's recusal otherwise actually or apparently prejudiced Appellant's proceedings. Where, as here, unlawful command influence is established at the trial level, a presumption of prejudice is created. Douglas, 68 M.J. at 354 (citing Biagase, 50 M.J. at 150). Therefore, to affirm Appellant's conviction "we must be convinced beyond a reasonable doubt that the unlawful command influence had no prejudicial impact on the court-martial." Id. (citing Biagase, 50 M.J. at 150-51).

By refusing to reverse any of LtCol Mori's defense-friendly rulings, including his ruling as to the definition of a "minor," Col Richardson foreclosed the possibility that Appellant would be unfairly prejudiced by LtCol Mori's recusal, and, following this ruling, no disinterested member of the public would harbor a significant doubt about the fairness of Appellant's proceedings.

First, LtCol Mori's ruling defining a "minor" as a child under the age of sixteen remained intact.

Second, while the majority asserts that "an objective member of the public would be left with the appearance and the

16

impression that the Government obtained advantage from its actions" because "[w]e cannot know how the first military judge would ultimately have ruled" with regard to the marital privilege issue, Salyer, __ M.J. at __ (32-33), the answer to that question is ultimately irrelevant to an objective, fully informed member of the public.  Even assuming that LtCol Mori ultimately would have ruled that:  (1) Appellant's statement to his then-wife was privileged; and (2) Appellant did not subsequently waive that privilege, Col Richardson's decision to admit Ms. Salyer's testimony that Appellant told her that his computer was broken was harmless beyond a reasonable doubt: both an FBI agent and an NCIS agent testified that Appellant told them that he had disposed of his computer while on deployment because it was broken.

The majority inexplicably ignores the fact that there was cause to seek LtCol Mori's recusal due to a perception of bias based on his personal circumstances and a related ruling that was, based on the law at the time, at least open to question, which is supported by the findings of fact made by Col Richardson, who saw and heard the witnesses at the unlawful command influence motion hearing.  Where, in this case, LtCol Mori's ruling as to the age of a "minor" remained intact after his recusal, no additional remedies were requested by Appellant, no unfairness regarding Col Richardson's handling of the trial

is alleged, and no harm to Appellant on findings or sentence has been demonstrated, I am hard-pressed to understand why we are in effect treating the Government's missteps in this case as structural error.[4]

Because I am convinced beyond a reasonable doubt that the actual or apparent effects of any unlawful command influence in this case were ameliorated by Col Richardson's remedial action and that Appellant received a fair trial, I would affirm the decision of the United States Navy-Marine Corps Court of Criminal Appeals.

---

[4] In the absence of an "orchestrated effort" to improperly remove LtCol Mori, Lewis, 63 M.J. at 414, the Government improperly accessing LtCol Mori's personnel file to confirm a rumor regarding the age of his wife at the time they married, after "his sua sponte raising the age issue and then ruling quickly and curtly in the defense's favor," should most properly be viewed through the lens of prosecutorial misconduct. But, of course, even assuming arguendo that the Government's conduct rose to the level of prosecutorial misconduct, Col Richardson's curative measures prevented Appellant's trial from being negatively affected by the misconduct such that no dismissal at all, let alone dismissal with prejudice, would be warranted. See Smith, 455 U.S. at 220 n.10 (recognizing that the proper remedy in cases of prosecutorial misconduct depends on "the misconduct's effect on the trial" and not "the blameworthiness of the prosecutor").